### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: <br><br> hhgregg, Inc., *et al.*, <br><br><div align=right>Debtors.</div> | Chapter 11 <br> Case No. 17-01302-RLM-11 <br> (Jointly Administered) |
| Electrolux Home Products, Inc., <br><div align=right>Plaintiff,</div><br><div align=center>v.</div><br> hhgregg, Inc., *et al.*, <br><div align=right>Defendants.</div> | Adversary Proceeding No. 17-50098 |

### ELECTROLUX HOME PRODUCTS, INC.'S
### FIRST AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff Electrolux Home Products, Inc. ("Electrolux"), for its Complaint against Defendants, hhgregg, Inc. ("hhgregg"), Gregg Appliances, Inc. ("Gregg"), HHG Distributing LLC ("HHG") (collectively hhgregg, Gregg and HHG are referred to as the "Debtors"), Wells Fargo Bank, National Association ("Wells Fargo"), Hilco Merchant Resources, LLC ("Hilco"), and Gordon Brothers Retail Partners, LLC ("Gordon Brothers") (collectively, Hilco and Gordon Brothers are referred to as the "Consultant") (collectively, the "Defendants"), alleges and says:

### JURISDICTION AND VENUE

1.     This Court has exclusive jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K), (N), and (O).

3.    This is an action for declaratory relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. §§ 105 and 541, Rule 57 of the Federal Rules of Civil Procedure, and Rule 7001(9) of the Federal Rules of Bankruptcy Procedure.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

5.    In accordance with the Federal Rule of Bankruptcy Procedure 7012(b), the Plaintiff consents to entry of final orders and judgment by the Court in connection with the claims asserted herein to the extent that it is later determined that the Court, absent consent of the Plaintiff, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### THE PARTIES

6.    Electrolux is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Electrolux is a party in interest within the meaning of 11 U.S.C. § 1109(b) and therefore has the requisite standing to assert these claims against the Defendants.

7.    Gregg, hhgregg, Inc., and HHG Distributing LLC are the Debtors herein and are organized under the laws of the State of Indiana.

8.    Wells Fargo is a national association bank with its principal place of business in Sioux Falls, South Dakota. Wells Fargo is a defendant herein in its capacity as the Administrative Agent and the Collateral Agent for the Prepetition Credit Agreement (as defined below) and for the DIP Credit Agreement (as defined below).

9.    Hilco is an Illinois limited liability company.

10.    Gordon Brothers is a Massachusetts limited liability company.

11.    A Committee of Unsecured Creditors was appointed by order of the Court on March 10, 2017 [Docket No. 118].

**FACTUAL BACKGROUND**

**A.  COMMENCEMENT OF THE BANKRUPTCY CASE.**

12.  On March 6, 2017, hhgregg, Inc., Gregg Appliances, Inc., and HHG Distributing LLC (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Southern District of Indiana (the "Court"). These bankruptcy cases were administratively consolidated under case no. 17-01302 (this "Case") by order of the Court entered on March 13, 2017 [Docket No. 139].

**B.  THE CONSIGNMENT AGREEMENT.**

13.  Gregg, pursuant to a Consignment Agreement dated March 11, 2011 (the "Consignment Agreement"), received certain goods on consignment from Electrolux (the "Electrolux Consignment Inventory"). A copy of the Consignment Agreement is attached hereto as Exhibit A.

14.  The Electrolux Consignment Inventory primarily consists of branded appliances, including Electrolux, Electrolux ICON, Gibson, Kelvinator, Tappan, and Frigidaire brand refrigerators, freezers, clothes washers, clothes dryers, ranges, stoves, cook tops, dishwashers, and other kinds of household and commercial appliances.

15.  Pursuant to the Consignment Agreement, Electrolux periodically delivered Electrolux Consignment Inventory to Gregg's store locations and distribution centers across the country, and all of the Electrolux Consignment Inventory was delivered to Gregg as consigned goods pursuant to the Consignment Agreement.

16.  At all times during their consignment relationship, and as expressly provided in the Consignment Agreement, Gregg and Electrolux acknowledged and agreed that all right, title, and

interest in and to all of the Electrolux Consignment Inventory remained with Electrolux and never transferred to Gregg.

17.    The Consignment Agreement expressly provides with regard to title to the Electrolux Consignment Inventory and its proceeds:

> The Consignor shall at all times retain title to all Consigned Merchandise. Upon the sale of the Consigned Merchandise; title to the proceeds shall vest in and remain the property of the Consignor until the Consignor is paid in full pursuant to the terms of this Agreement. The Consignee agrees to hold the Consigned Merchandise in trust for the Consignor as Consignor's property, for the sole purpose of selling the Consigned Merchandise and the Consigned Merchandise shall only be sold by the Consignee in its ordinary course of business. The Consigned Merchandise shall at all times be subject to the direction and control of the Consignor, and upon demand by the Consignor, the Consignee shall return any unsold Consigned Merchandise to the Consignor. ¶ 2.

> In order to secure Consignor with respect to the Consigned Merchandise and any and all moneys due to the Consignor herein, the Consignee * * *[agrees] * * * to execute and/or permit to be filed any * * * documents * * *to perfect the Consignor's *ownership interest* in the Consigned Merchandise and the proceeds thereof. ¶ 5 (emphasis added).

18.    The Consignment Agreement expressly provides with regard to identification and segregation of the Electrolux Consignment Inventory:

> The Consignment Merchandise shall be readily identifiable and distinguishable from the inventory owned by the Consignee. ¶ 1.

> The Consigned Merchandise shall remain free and clear of all liens, security interest, claims, and encumbrances. ¶ 3(e).

19.    The Consignment Agreement further provides with regard to payment to Electrolux by Gregg:

> On every Tuesday (for all sales for the previous week ending Sunday), Consignee shall send a written report to Consignor setting forth the sales of Consigned Merchandise, by model and location (the "Report"). Within one (1) day from the date of each Report, Consignee shall make payment to Consignor, via Consignor's designated on-line payment system for Consignees, in an amount equal to the Consigned Merchandise Cost (as defined herein). As used herein, the term "Consigned Merchandise Cost" shall mean the sum of (i) the Consigned Merchandise prices as set by Consignor and (ii) shipping costs. The Consigned Merchandise Cost shall be at the current established price. ¶ 7(a).

Within three (3) business days of the end of each calendar month, Consignee shall send a written report to Consignor summarizing the value of the unsold Consigned Merchandise in Consignee's possession by Location. In the event that Consignee's aggregate balance of Consigned Merchandise is less than Consignee's aggregate open invoice balance as prepared by Consignor, or any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor, via Consignor's designated on-line payment system, the Consigned Merchandise Cost for such shortfall within seven (7) days of the date of such report. In addition, in the event that such report discloses that the aggregate balance of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor. ¶ 7(b).

20. For all of the reasons set forth above, and additional reasons, Electrolux has at all times been, and remains, the owner of all Electrolux Consignment Inventory while it is in the possession of Gregg, and all proceeds of the Electrolux Consignment Inventory.

21. For all of the reasons set forth above, and additional reasons, the Consignment Agreement is a true consignment and is not a security or financing agreement.

22. The Consignment Agreement does not require Electrolux to deliver any of Electrolux's branded products to Gregg, and at any time Electrolux is entitled to stop providing Electrolux's branded products to Gregg and end the Consignment Agreement. ¶¶ 1 and 2.

23. The Consignment Agreement requires Gregg to return the Electrolux Consignment Inventory upon demand by Electrolux. ¶¶ 2 and 4.

24. The Consignment Agreement provides that the Electrolux Consignment Inventory shall only be sold in the ordinary course of business and does not allow sale of the Electrolux Consignment Inventory in a liquidation or going out of business sale. ¶¶ 2.

25. The Consignment Agreement prohibits any relocation of the Electrolux Consignment Inventory without Electrolux's prior written consent. ¶ 3(a).

26. The Consignment Agreement provides that Gregg holds the Electrolux Consignment Inventory and proceeds in trust for purposes of fulfilling the terms of the Consignment

5

Agreement, namely the sale of the Electrolux Consignment Inventory and remittance of proceeds to Electrolux. ¶ 4.

27. The Consignment Agreement is governed by North Carolina law applicable to contracts made and to be performed wholly within that state. ¶ 27.

## C. THE DEBTORS HAVE NOT GRANTED AND CANNOT GRANT A SECURITY INTEREST IN THE ELECTROLUX CONSIGNMENT INVENTORY, WHETHER PREPETITION OR POSTPETITION.

28. On March 7, 2017, the Debtors filed a *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* [Docket No. 18] in this Case (the "DIP Motion").

29. Attached to the DIP Motion as Exhibit B is a proposed Debtor in Possession Credit Agreement (the "DIP Credit Agreement").

30. Through numerous provisions, the DIP Credit Agreement assiduously and expressly makes it clear that the DIP Credit Agreement does not have the effect of granting a postpetition security interest in or lien upon any of the Electrolux Consignment Inventory that would have priority over Electrolux's interest in the Electrolux Consignment Inventory:

    a.   The definition of Eligible Commercial Accounts (for use in calculating the Borrowing Base) excludes accounts that arise from sales on consignment. ¶ 1.60(d).

    b.   The definition of Eligible Credit Card Receivables (for use in calculating the Borrowing Base) excludes receivables that arise from sales on consignment. ¶ 1.61(b).

    c.    The definition of Eligible Inventory (for use in calculating the Borrowing Base) excludes inventory that is "purchased or sold on consignment, including without limitation, Frigidaire Consignment Collateral * * *." ¶ 1.63(l).

    d.    By definition, "Frigidaire Consignment Collateral" means all inventory manufactured or distributed by Electrolux, and "Frigidaire" means Electrolux. ¶¶ 1.93 and 1.95 and Schedule 1.C.

    e.    By definition, "Frigidaire Consignment Agreement" means the Consignment Agreement, dated September 24, 2003, by and between Frigidaire and Gregg with respect to certain inventory manufactured by Frigidaire and sold by Gregg, "as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced." ¶ 1.94.

31. The Consignment Agreement *is* a renewal, restatement, or replacement of the Frigidaire Consignment Agreement.

32. Therefore, the DIP Credit Agreement expressly excludes granting a postpetition security interest in or lien upon any of the Electrolux Consignment Inventory and proceeds that would have the effect of having priority over Electrolux's interest in the Electrolux Consignment Inventory.

33. On March 7, 2017, the Court entered its *Interim Order (I) Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* [Docket No. 50] in this Case (the "Interim DIP Order").

34. The Interim DIP Order approved the DIP Credit Agreement on an interim basis.

35. At the "first day" hearing on March 7, 2017, the Debtors' counsel, in arguing for the granting of the DIP Motion and the other first day motions, represented to the Court that Electrolux was a major consignment vendor of the Debtors and was essential to the Debtors' ongoing business operations, the Chapter 11 cases, and a successful reorganization.

36. The Debtors are parties to that certain Amended and Restated Loan and Security Agreement dated as of March 29, 2011 (collectively with all amendments thereto, the "Prepetition Credit Agreement"), by and among Gregg, as borrower, and Wells Fargo as administrative agent and collateral agent for the Prepetition Secured Parties, as that term is defined in the DIP Credit Agreement.

37. On information and belief, the Prepetition Credit Agreement was in part the model for the DIP Credit Agreement, and the Prepetition Credit Agreement also expressly excludes the granting of any security interest in the prepetition Electrolux Consignment Inventory that would have the effect of having priority over Electrolux's interest in the Electrolux Consignment Inventory. Specifically, the Prepetition Credit Agreement provides as follows:

    a.  1.44 "Eligible Inventory" excludes "Inventory purchased or sold on consignment, including without limitation, Frigidaire Consignment Collateral * * *."

    b.  7.1(a)(i) <u>Collateral Reporting</u> requires the Debtors to provide weekly and monthly reports (C) inventory reports by categories, location and mix (including indicating the amounts of Inventory at warehouses and stores, and detail regarding Inventory subject to the Frigidaire Consignment Agreement) * * *."

    c.  7.1(a)(iii) <u>Collateral Reporting</u> requires the Debtors to provide monthly "reports regarding the inventory subject to the Frigidaire Consignment Agreement."

    d.  10.1(i) <u>Events of Default</u> includes defaults under "Material Contracts" including the "Frigidaire Consignment Agreement."

38. The Consignment Agreement between Electrolux and Gregg provides that Electrolux "shall at all times retain title to all Consigned Merchandise." Thus, pursuant to the terms of the Consignment Agreement, the Electrolux Consignment Inventory was never "owned" nor "hereafter acquired" by Gregg. Instead, the Electrolux Consignment Inventory was, at all times prior to sale to a Gregg customer, owned by Electrolux.

39.  The Electrolux Consignment Inventory and proceeds are not owned by the Debtors, and are expressly and specifically recognized in the DIP Credit Agreement as the property of Electrolux and not subject to any superior rights of the lenders.

**D.   THE DEBTOR'S POSTPETITION SALES OF THE ELECTROLUX CONSIGNMENT INVENTORY.**

40.  Pursuant to the Consignment Agreement, Gregg was obligated to make a payment to Electrolux on Wednesday, March 8, 2017, for Gregg's sales of Electrolux Consignment Inventory during the previous seven-day period ending on March 5, 2017. The amount that was due and owing to Electrolux and should have been paid by Gregg on March 8 was not less than $2,046,717.87. Gregg was further obligated to make a payment to Electrolux on Wednesday, March 15, 2017, for Gregg's sales of Electrolux Consignment Inventory during the previous seven-day period ending on March 12, 2017, which is in an unknown amount.  Since the Chapter 11 filing, through April 10, 2017, the amount unpaid, and due and owing to Electrolux, is $10,855,849.81.

41.  Despite demand by Electrolux, Gregg has failed and refused to make either of these payments to Electrolux.

42.  By order entered on March 13, 2017 [Docket No. 137] (the "Interim Store Closing Order")., the Court granted on an interim basis the Debtors' first-day motion to continue their store-closing sales, which had commenced prepetition on March 3, 2017.

43.  Paragraph 23 of the Interim Store Closing Order allows the Debtors and the Consultant (as defined in the Store Closing Order) to sell "Merchandise" free and clear of liens and encumbrances, and directs the Debtors to use the proceeds of these sales to pay existing secured debt consistent with the Interim DIP Order and the DIP Credit Agreement.

44.  Paragraph 8 of the Interim Store Closing Order authorizes the Debtors to continue the Store Closing Sales "in accordance with this Interim Order, the Sale Guidelines, and the

Agreement." The Agreement is defined as the Consulting Agreement that is attached to that order as Exhibit 1.

45. In Section 2 of this Consulting Agreement, "Merchandise" is defined generally as all goods that are saleable in the ordinary course, but the definition excludes goods held on consignment, which are defined as "Consigned Goods." Consigned Goods, and some other goods excluded from the definition of "Merchandise," are collectively defined as the "Non-Merchandise Goods."

46. Section 6.d(ii) of the Consulting Agreement provides a fee schedule to be paid the Consultant from Gross Proceeds, but excludes "Gross Proceeds from Consigned Goods." Immediately below this fee schedule, the Consulting Agreement states that "***Consultant shall sell Non-Merchandise Goods*** during the Sale at the Stores, and in consideration of such services, Consultant shall earn a fee equal to * * *." (emphasis added).

47. Therefore, the Consulting Agreement is subject to the interpretation of allowing the sale of Electrolux Consignment Inventory, and thus such sale could be allowed by the Interim Store Closing Order, and the proceeds of such sales of the Electrolux Consignment Inventory would under this interpretation be paid to Wells Fargo under the Interim DIP Order.

48. On information and belief, Gregg continues to sell the Electrolux Consignment Inventory, and Gregg has failed and refused to pay Electrolux any proceeds received from the sale of Electrolux Consignment Inventory.

49. On April 7, 2017, the Court approved the Debtors' Phase II liquidation sale, and the Debtors continue to sell the Electrolux Consignment Inventory without paying Electrolux the obligations owed to it.

50. On information and belief, the proceeds from the sale of Electrolux Consignment Inventory have not been segregated for Electrolux's benefit. Rather, the proceeds have been

commingled with Gregg's operating funds and are being paid to Wells and the other lenders under the DIP Order.

51. Gregg's actions stated above constitute a breach of its performance obligations under the Consignment Agreement and a default under and breach of the Consignment Agreement. This default and breach materially prejudices the rights of Electrolux in and to the Electrolux Consignment Inventory as provided in the Consignment Agreement.

52. Section 10.1 of the DIP Credit Agreement lists Events of Default under that agreement. Subsection (f)(ii) defines one of the Events of Default as "any default by Borrower or any Obligor under any Material Contract (including, without limitation, any of the Credit Card Agreements or the Frigidaire Consignment Agreement) * * *."

53. Therefore, Gregg's default under the Consignment Agreement comprises a default under the DIP Credit Agreement.

54. Unless Defendants Gregg, the Consultant and Wells Fargo are immediately enjoined, Electrolux will suffer irreparable harm because:

    a. The Debtors have and continue to dispose of Electrolux Consignment Inventory without permitting Electrolux to be fully and fairly heard on this issue in an Adversary Proceeding. Any sale of the Electrolux Consignment Inventory prior to a determination of the Debtors' interest in such property is in direct violation of controlling precedent. *See SLW Capital, LLC v. Mansaray-Ruffin,* 530 F.2d 230, 237 (3rd. Cir. 2008); *See, i.e., SLW Capital, LLC v. Mansaray-Ruffin,* 530 F.2d 230, 237 (3rd. Cir. 2008); *In re Whitehall Jewelers*, No. 08-11261 (KG), 2008 Bankr. LEXIS 2120 (Bankr. D. Del. July 28, 2008.)

    b. Debtors are seeking to liquidate all their assets on or before on or before April 25, 2017 pursuant to the Bidding Procedures Motion and the Hilco Motion. As a result, there will be no determination of the Debtors' interest in the Electrolux Consignment Inventory prior to the Debtors' expedited sales in these Chapter 11 Cases.

    c. Debtors are selling Electrolux Consignment Inventory at discount prices, without remitting any proceeds of sale to Electrolux, as required by the Electrolux Consignment Agreement.

    d. The Bidding Procedures Motion and the Hilco Motion seek to immediately liquidate inventory in all of the Debtors' stores and sell such property free and

    clear of all liens, claims, encumbrances, and interests, and that the proceeds of the sales will be paid to Wells Fargo.

e.    The DIP Motion seeks authority to grant first priority security interests in and liens on all assets of the Debtors, including all previously unencumbered assets. To the extent the DIP Motion seeks to impair Electrolux's ownership interest in the Electrolux Consignment Inventory, the Debtors have no legal basis to grant an interest in property that is not property of their estates.

f.    Use, sale or impairment of the Electrolux Consignment Inventory without Electrolux's consent is an unlawful conversion of such property to which there is no adequate remedy at law.

g.    Electrolux will suffer serious and irreparable financial losses if the Electrolux Consignment Inventory is sold at discounted prices. Electrolux cannot specifically identify the financial losses until it obtains all records for the current status of the Consignment Inventory.

### FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT - OWNERSHIP)

55. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

56. This is an action for declaratory relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. §§ 105 and 541, 546, Rule 57 of the Federal Rules of Civil Procedure, and Rules 7001 and 7001(9) of the Federal Rules of Bankruptcy Procedure.

57. There is a bona fide, actual, present, and practical need for a declaration regarding the ownership rights of the Electrolux Consignment Inventory, the rights of Gregg to sell the Electrolux Consignment Inventory, the rights of Electrolux to the proceeds of the sales of the Electrolux Consignment Inventory, and the right of Electrolux to regain possession of the Electrolux Consignment Inventory.

58. An actual controversy exists for which necessary and proper relief may be granted by declaratory judgment.

59. The declaration requested herein deals with a present, ascertained, or ascertainable state of facts, or a present controversy as to a state of facts.

60.  hhgregg, Gregg, HHG, Wells Fargo and the Consultant have, or reasonably may have, an actual, present, adverse, and antagonistic interest in this Court's determination that Electrolux owns the Electrolux Consignment Inventory and the proceeds of the sale of the Electrolux Consignment Inventory that the Electrolux Consignment Inventory may be sold by Gregg only pursuant to the terms of the Consignment Agreement and that Electrolux may repossess the Electrolux Consignment Inventory.

61.  There are no other parties known to have an interest in this determination other than the parties to this proceeding.

62.  The declaratory relief sought would not amount to the giving of legal advice by this Court, nor would it answer questions propounded from curiosity.

63.  All conditions precedent to initiating and maintaining this proceeding have been performed, have occurred, or been waived.

64.  Therefore, Electrolux seeks a declaratory judgment prohibiting the sale of the Electrolux Consignment Inventory except in compliance with all of the terms of the Consignment Agreement, and, determining that Electrolux is the sole owner of the Electrolux Consignment Inventory and proceeds

## SECOND CAUSE OF ACTION
### (DECLARATORY JUDGMENT – TRUE CONSIGNMENT)

65.  Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

66.  Electrolux seeks a declaratory judgment prohibiting the sale of the Electrolux Consignment Inventory except in compliance with all of the terms of the Consignment Agreement, and in particular:

      a.   Determining that the Consignment Agreement is a true consignment agreement and not a financing or security agreement.

b. Determining that neither Gregg nor any other of the Debtors has or ever had the authority to grant a security interest in or lien upon the Electrolux Consignment Inventory.

c. Determining that neither Wells Fargo nor any other entity has a security interest in or lien upon the Electrolux Consignment Inventory.

d. Determining that Electrolux is entitled to the proceeds of all prepetition and postpetition sales of the Electrolux Consignment Inventory as provided by the Consignment Agreement.

e. Determining that the Consignment Agreement provides Electrolux with the right to demand the immediate return of the Electrolux Consignment Inventory.

f. Determining that neither Gregg nor the Consultant has the right to sell any of the Electrolux Consignment Inventory in a liquidation sale or in a sale under section 363 of the Code.

g. Determining that Gregg and the Consultant may sell the Electrolux Consignment Inventory solely in the ordinary course of the Debtors' business.

h. In the alternative to the preceding paragraph, terminating any implied license of Gregg to sell Electrolux Consignment Inventory bearing Electrolux's trademarks and to use other intellectual property rights belonging to Electrolux.

### THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT - DEBTORS)

67. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

68. By failing and refusing to make payments to Electrolux as required by the Consignment Agreement and for the other reasons stated above, Gregg has breached the Consignment Agreement.

69. Pursuant to Gregg's breach of the Consignment Agreement, Electrolux is entitled to payment for all Electrolux Consignment Inventory sold by Gregg, whether prepetition or postpetition.

70. Pursuant to Gregg's breach of the Consignment Agreement, Electrolux is entitled to possession of Electrolux Consignment Inventory remaining in the possession of Gregg.

14

## FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT – WELLS FARGO)

71. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

72. Electrolux and Wells Fargo, as successor in interest and on behalf of itself and as Agent for the lenders, are parties to the Intercreditor Agreement dated February 3, 2005 (the "Intercreditor Agreement").

73. The Intercreditor Agreement provides that in the event of a Cash Dominion Event, as defined in the Intercreditor Agreement, and upon notice to Agent, Agent shall pay over to Electrolux the amount of proceeds deposited into or received into the lockbox or blocked account.

74. On information and belief, a Cash Dominion Event occurred.

75. The Intercreditor Agreement requires that the Agent provide to Electrolux written notice of either a default or an event of default under its agreements with the Debtors.

76. The Intercreditor Agreement provides that the ownership and security interest in and liens upon the Consignment Collateral, as defined in the Intercreditor Agreement, have and shall have priority over the security interests of Agent, if any.

77. The Intercreditor Agreement provides that the Agent will not contest the validity, perfection, priority or enforceability of the liens of Electrolux upon the Consignment Collateral. Electrolux agreed to not contest the validity, perfection, priority or enforceability of the liens upon the Revolving Loan Collateral of Agent.

78. Electrolux has not contested the Agent liens upon the Revolving Loan Collateral, as defined in the Intercreditor Agreement.

79. The Agent has not paid the amount of proceeds to Electrolux, has not provided Electrolux notice of default by the Debtors under the loan agreements, and has contested Electrolux's ownership and priority position in the Consignment Collateral.

80. As a result, the Agent has breached its obligations owed to Electrolux under the Intercreditor Agreement and the Agent is liable to Electrolux in an amount equal to the amount paid by Gregg to Agent that arose from the Debtors' sale of Electrolux Consignment Inventory, plus interest and attorney fees.

## FIFTH CAUSE OF ACTION
### (RELIEF FROM STAY)

81. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

82. As stated above, Gregg has mere possession of the Electrolux Consignment Inventory and no ownership rights in the Electrolux Consignment Inventory.

83. Pursuant to Gregg's breach of the Consignment Agreement, Gregg is no longer entitled to possession of the Electrolux Consignment Inventory.

84. Electrolux is entitled to relief from stay in order to repossess the Electrolux Consignment Inventory.

## SIXTH CAUSE OF ACTION
### (CONSTRUCTIVE TRUST)

85. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

86. Pursuant to the Consignment Agreement, Gregg holds the Electrolux Consignment Inventory and the proceeds from the sale of any of the Electrolux Consignment Inventory in trust for Electrolux.

87. Electrolux is entitled to an accounting from Gregg and return of all Electrolux Consignment Inventory and payment of all amounts due under the Consignment Agreement from the sale of Electrolux Consignment Inventory.

88. Under the DIP Order, all cash receipts by the Debtor are "swept" by Wells Fargo and used to satisfy obligations owed to it.

89. Electrolux is entitled to an accounting from Wells Fargo regarding all cash receipts received arising from the sale of Electrolux's consignment inventory, and is entitled to payment from Wells Fargo of all such proceeds.

90. Wells Fargo holds all such proceeds in constructive trust for the benefit of Electrolux and the proceeds therefrom.

## SEVENTH CAUSE OF ACTION
### (CONVERSION)

91. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

92. Gregg continues to sell the Electrolux Consignment Inventory, and Gregg has wrongfully failed and refused to pay Electrolux proceeds received from the sale of Electrolux Consignment Inventory. The proceeds are instead swept into an account controlled by Wells Fargo on behalf of the lenders.

93. Gregg and Wells Fargo, on behalf of the lenders, wrongfully retain possession of the unsold Electrolux Consignment Inventory.

94. Gregg and Wells Fargo, on behalf of the lenders, have converted the Electrolux Consignment Inventory and the proceeds from the sale of Electrolux Consignment Inventory.

95. Electrolux has suffered damages from such conversion of the Electrolux Consignment Inventory.

96. Because of such conversion of the Electrolux Consignment Inventory, Electrolux is entitled to payment from Gregg and Wells Fargo, on behalf of lenders, as calculated under the Consignment Agreement for all Electrolux Consignment Inventory sold by Gregg and to have Gregg surrender to Electrolux of all Electrolux Consignment Inventory in the possession of Gregg.

## EIGHTH CAUSE OF ACTION
## (UNJUST ENRICHMENT – WELLS FARGO)

97. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

98. Wells Fargo had specific and express knowledge of Electrolux's Consignment Agreement and Electrolux's ownership interest in the Electrolux Consignment Inventory.

99. At all times, Wells Fargo specifically excluded the Electrolux Consignment Inventory from its collateral and its borrowing base, and expressly deemed the Electrolux Consignment Inventory as ineligible collateral.

100. Wells Fargo did not extend any credit to Gregg based on and otherwise did not rely on the Electrolux Consignment Inventory in connection with any of its business transactions with Gregg.

101. Based on the Consignment Agreement, Electrolux shipped substantial volumes and variety of products to Gregg in support of Gregg's business operations to allow Gregg to always have the necessary quantities and product for Gregg to maximize its business operations.

102. Failure of support from Electrolux would have caused material financial damage to Gregg's business operations. In fact, Wells Fargo identified the Consignment Agreement as a "Material Contract" in the Prepetition Credit Agreement, and a default under the Consignment Agreement was a default of the Prepetition Credit Agreement.

103. Wells Fargo's assertion of any interest in the Electrolux Consignment Inventory will materially prejudice and economically damage Electrolux.

104. On information and belief, Wells Fargo has asserted or may assert a position contrary to the terms of the Consignment Agreement and compliance therewith, materially prejudicial to Electrolux's ownership of the Electrolux Consignment Inventory and its proceeds.

105. Wells Fargo's assertion of an interest in the Electrolux Consignment Inventory would unjustly enrich Wells Fargo at Electrolux's expense and prejudice.

106. Wells Fargo should be precluded and prohibited from asserting any interest in or benefitting from the Electrolux Consignment Inventory.

## NINTH CAUSE OF ACTION
## (UNJUST ENRICHMENT - DEBTORS' ESTATE)

107. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

108. Shipment of goods by Electrolux to Gregg pursuant to the Consignment Agreement materially enhanced Gregg's inventory product offerings for customers, allowing Gregg to generate substantial revenue to maintain a chain of 220 stores throughout the United States.

109. As a result, Gregg was able to purchase goods from vendors on open account, and such vendors made substantial profit for many years.

110. Creditors had knowledge that Gregg sold to its customers Electrolux's branded products.

111. On information and belief, creditors knew that the Electrolux Consignment Inventory was delivered on consignment and that Electrolux owned the Electrolux Consignment Inventory at all times.

112. Any assertion by the Debtors of any interest in the Electrolux Consignment Inventory would materially prejudice the rights of Electrolux.

113. Debtors have asserted or may assert a position contrary to the terms of the Consignment Agreement and compliance therewith.

114. The Debtors should be precluded and prohibited from asserting any interest in or benefitting from the Electrolux Consignment Inventory.

### TENTH CAUSE OF ACTION
### (ESTOPPEL ALL PARTIES)

115. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

116. The Consignment Agreement between Electrolux and Gregg included, among other provisions, an agreement that Electrolux owned the Electrolux Consignment Inventory and contained a promise by Gregg to comply with the Consignment Agreement, including timely payment to Electrolux upon the sale of the Electrolux Consignment Inventory.

117. Electrolux has performed all of its obligations under the Consignment Agreement at all times, and Gregg and its business and various stakeholders have materially benefitted from Electrolux's compliance with its obligations under the Consignment Agreement.

118. Electrolux's performance was in reliance on Gregg's performance of its obligations under the Consignment Agreement, including payment to Electrolux upon the sale of the Electrolux Consignment Inventory.

119. Gregg's failure to perform its obligations under the Consignment Agreement is detrimental to Electrolux.

120. It is unconscionable for Gregg to not perform its obligations under the Consignment Agreement, and for any party to assert any interest in the Electrolux Consignment Inventory or proceeds thereof. Gregg and the other defendants should each be estopped from asserting any rights or taking action adverse or prejudicial to Electrolux's rights under the Consignment Agreement and with respect to the Electrolux Consignment Inventory and proceeds.

20

121. Based on the express exclusions of the Electrolux Consignment Inventory and proceeds in the Credit Agreements, Wells Fargo, on behalf of the lenders, should be estopped from asserting any rights or taking action adverse or prejudicial to Electrolux's rights under the Consignment Agreement and with respect to the Electrolux Consignment Inventory and proceeds.

## ELEVENTH CAUSE OF ACTION
### (MARSHALLING)

122. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

123. Wells Fargo asserts a first priority lien on the Debtors' assets (not including Electrolux's consignment inventory and proceeds).

124. Wells Fargo as set forth above, assiduously excluded Electrolux's consignment inventory and proceeds from its collateral and borrowing base.

125. Upon the filing of the Chapter 11 case, Wells Fargo has attempted, in the DIP Motion, to effectively seize the Electrolux Consignment Inventory and all proceeds thereof as part of its collateral.

126. Wells Fargo's loans to the Debtors were in no way based on the Electrolux consignment inventory and proceeds, which was expressly excluded.

127. Electrolux has no lien on the Debtors' assets.

128. Wells Fargo asserts its rights to be paid arising from its lien on the Debtors' assets.

129. Wells Fargo may not take action to defeat Electrolux's ownership interest under the doctrine of marshalling.

**TWELFTH CAUSE OF ACTION**
**(THIRD PARTY BENEFICIARY)**

130. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

131. The Prepetition Credit Agreement and the DIP Credit Agreement (the "Credit Agreements") specifically and expressly exclude the Electrolux consignment inventory from the liens and security interests of the lenders, and from the Debtors' borrowing base.

132. The Prepetition Credit Agreement and the DIP Credit Agreement (the "Credit Agreements") provide that the Electrolux Consignment Agreement is a "Material Contract", the default of which constitutes a default under the Credit Agreements.

133. Wells Fargo deemed Electrolux's Consignment Agreement essential to the Debtors' business operation, and sought to protect itself if the Debtors breached the Consignment Agreement.

134. Wells Fargo's loan covenant regarding "Material Contracts" was intended to insure performance of the Consignment Agreement by the Debtors.

135. Electrolux was a beneficiary of such loan covenants.

136. The DIP Credit Agreement additionally includes an approved budget providing for the payment of consignment vendors and Electrolux is the intended benefit of such provision.

137. As the intended third party beneficiary to the DIP Credit Agreement, Electrolux is entitled to enforce the terms of the DIP including but not limited to payment to Electrolux in compliance with the budget and the exclusion of the Electrolux consignment inventory and proceeds from the lenders' liens and security interests under the Credit Agreements.

## THIRTEENTH CAUSE OF ACTION
### (WAIVER)

138. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein, including but not limited to the provisions in the Credit Agreements regarding Electrolux's consignment inventory and proceeds, and the Electrolux Consignment Agreement.

139. Wells Fargo has waived any rights to any interest in Electrolux' consignment inventory and proceeds thereof.

## FOURTEENTH CAUSE OF ACTION
### (RECLAMATION)

140. Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

141. In the alternative and reserving all its rights regarding all causes of action herein, Electrolux hereby pleads its reclamation rights.

142. Within 45 days immediately before the Petition Date, Debtors received certain goods that Electrolux delivered to Debtors (the "Reclaimed Goods").

143. On March 24, 2017, Electrolux sent a written demand for reclamation to Debtors demanding the return of the Reclaimed Goods (the "Demand"). A copy of the Demand is attached as Exhibit B. The Reclaimed Goods have an aggregate value of not less than $9,344,781.39.

144. Debtors are parties to an Amended and Restated Loan and Security Agreement dated March 29, 2011, as amended (the "Prepetition Credit Agreement"), as more fully set forth in Debtors' *Motion for Interim and Final Orders (I) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364; (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III)*

23

*Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* (the "DIP Motion") [Dkt. No. 18].  (*See e.g.*, Dkt. No. 18 ¶¶ 6-8.)

145. Wells is the Administrative Agent, Collateral Agent, and FILO Agent under the Prepetition Credit Agreement.

146. Under the Prepetition Credit Agreement, Debtors granted Wells a security interest in and lien upon all "Collateral" as defined in the Prepetition Credit Agreement, which includes Debtors' inventory and the Reclaimed Goods (*Id.* ¶ 8.)

147. Upon information and belief, Wells was fully informed and aware of Debtors' financial condition in the months leading up to the Petition Date.

148. Upon information and belief, Debtors were insolvent at least as of 45 days prior to the Petition Date.

149. Upon information and belief, Wells was aware that Debtors were insolvent 45 days prior to the Petition Date and at the time that Debtors received the Reclaimed Goods.

150. Upon information and belief, Wells was aware that Debtors could not and would not pay Electrolux for all the Reclaimed Goods at the time Debtors received them.

151. Upon information and belief, Wells obtained the benefit of the Reclaimed Goods, knowing that Debtors would not pay Electrolux to either secure extensions of credit under the Prepetition Credit Agreement or utilize the proceeds of the Electrolux Consigned Inventory, including the Reclaimed Goods, to allow the Debtors to continue to operate in the ordinary course.

152. Upon information and belief, Wells financed Debtors' continued operations in order to perpetuate Debtors as the best vehicle to orderly liquidate Wells' collateral and maximize Wells' recovery.

153. As set forth in the DIP Motion and the order granting the DIP Motion on an interim basis ("Interim DIP Order") [Dkt. No. 50], a DIP financing agreement was approved on an interim basis (the "DIP Financing Agreement") [Dkt. No. 18 at Ex B (DIP Financing Agreement)].

154. Electrolux filed an Objection to the DIP Motion, objecting to approval of the DIP Motion on a final basis, and a Supplemental Objection for the reasons stated in such Objection [Dkt. No. 269 and 549.]

155. To date, Debtors continue to sell the Reclaimed Goods despite Electrolux's timely Demand.  The amount of Reclaimed Goods that remain in Debtors' possession as of the petition date is $9,344,781.39 and continues to be irreparably harmed, as a result of the sale of the Reclaimed Goods without paying the Obligations owed to Electrolux as set forth above.

156. Electrolux's right to recover actual possession of the Reclaimed Goods is a possessory right that is not compensable through a money judgment and as a result, Electrolux will suffer irreparable harm if the Reclaimed Goods are not returned to Electrolux.

157. Upon information and belief, Wells is not, within the meaning of § 2-702 of the Uniform Commercial Code, a good faith purchaser or buyer in the ordinary course and, as such, does not have a priming lien with respect to Electrolux's reclamation claim in the Reclaimed Goods or proceeds from the Reclaimed Goods under Bankruptcy Code § 546(c).

158. As a result, Electrolux's right to the Reclaimed Goods and proceeds of the Reclaimed Goods is not subject to Lenders' lien in the Reclaimed Goods.

159.In addition, the Financing Motion and Interim Order provide that all cash, collections, and proceeds of the Pre-Petition Collateral and DIP Collateral are to be paid to the Pre-Petition Agent for application in reduction of the Pre-Petition Credit Agreement Loans and that upon entry of the Final Order, the Debtors will apply proceeds of the DIP Credit Agreement to pay all remaining Pre-Petition Secured Debt in full (the "Roll-Up").

160.Even if Wells qualifies as a good faith purchaser, to the extent loans under the Pre-Petition Credit Agreement have been "rolled-up," Electrolux's reclamation claim is first in priority and right. *In re Reichhold Holdings US, Inc.*, 556 B.R. 107 (Bankr. D. Del. 2016).

161.Electrolux is entitled to immediate possession of the Reclaimed Goods from Debtor under Bankruptcy Code § 546(c).

162.Electrolux has a reclamation right to the Reclaimed Goods based on Electrolux's Demand, as well as a first priority lien in the Reclaimed Goods and proceeds from Debtors' sale of the Reclaimed Goods.

163.The lenders' purported first priority lien under the Pre-Petition Credit Agreement and DIP Financing Agreement is subordinate to Electrolux because lenders are not buyers in the ordinary course, good faith purchasers, or otherwise entitled to a first priority lien under 2-702 of the Uniform Commercial Code or Bankruptcy § 546(c).

164.Debtors' have not honored Electrolux's Demand, continues to sell the Reclaimed Goods, and has not paid the proceeds to Electrolux.

### PRAYER FOR RELIEF

**WHEREFORE**, Electrolux respectfully requests entry of a judgment in its favor and against Defendants as follows:

1.   Determining that the Consignment Agreement is a true consignment agreement and not a financing or security agreement;

2.     Determining that Electrolux is the sole owner of the Electrolux Consignment Inventory and proceeds thereof;

3.     Determining that neither Gregg nor any other of the Debtors has or ever had the authority to grant a security interest in or lien upon the Electrolux Consignment Inventory and proceeds thereof;

4.     Determining that neither Wells Fargo nor any other entity has a security interest in or lien upon the Electrolux Consignment Inventory and proceeds thereof;

5.     Determining that Electrolux is entitled to the proceeds of all prepetition and postpetition sales of the Electrolux Consignment Inventory as provided by the Consignment Agreement;

6.     Determining that the Consignment Agreement provides Electrolux with the right of the immediate return of the Electrolux Consignment Inventory;

7.     Determining that neither Gregg nor the Consultant has the right to sell any of the Electrolux Consignment Inventory in a liquidation sale or in a sale under section 363 of the Code;

8.     Determining that Gregg and the Consultant may sell the Electrolux Consignment Inventory solely in compliance with all terms and conditions of the Consignment Agreement, in the ordinary course of the Debtors' business;

9.     In the alternative to the immediately preceding paragraph, terminating any implied license of Gregg to sell the Electrolux Consignment Inventory bearing Electrolux's trademarks and to use other intellectual property rights belonging to Electrolux and ordering Gregg to return to Electrolux all Electrolux Consignment Inventory;

10.     Determining that Wells Fargo has breached its obligations to Electrolux under the Intercreditor Agreement, and that Electrolux is entitled to money damages arising from such defaults;

11.  Determining that the assertion of any interest in the Electrolux Consignment Inventory and proceeds by the Debtors, Wells Fargo, or the Consultant would unjustly enrich such parties;

12.  Determining that the Debtors, Wells Fargo, and the Consultant should be estopped from asserting any interest in the Electrolux Consignment Inventory and proceeds or from interfering with the Debtors' compliance with the Consignment Agreement;

13.  Determining that the doctrine of marshalling applies and that Wells Fargo is prohibited from any action that prejudices Electrolux's ownership of Electrolux's consignment inventory and proceeds;

14.  Determining that Electrolux is a third-party beneficiary to the Credit Agreements and is entitled to their performance relating to the exclusion of Electrolux's consignment inventory from any interest of Wells Fargo and payment of all proceeds of the sale of the consignment inventory to Electrolux;

15.  Determining that Wells Fargo has waived any rights to assert any interest in Electrolux's consignment inventory and proceeds and any entitlement to receive and pay itself from the proceeds of the consignment inventory;

16.  Determining that Electrolux's right and interest in the Reclaimed Goods and all proceeds of the Reclaimed Goods is first in priority and right and any right, title or interest of Debtors and lenders is junior and subordinate to Electrolux's right and interest in the Reclaimed Goods;

17.  Ordering Debtors and the lenders to deliver to Electrolux an accounting of: (i) by serial number, all sales of Reclaimed Goods, including sale price and sale date; (ii) by serial number, an inventory of all Reclaimed Goods that remain on hand, including store location; and (iii) all proceeds received on account of Reclaimed Goods;

18.  Ordering Debtors and lenders to segregate all proceeds from the sale of the Reclaimed Goods;

19.  Awarding Electrolux its costs of suit incurred herein, including its reasonable attorneys' fees, to the extent provided by contract or applicable law; and

20.  Awarding such other and further relief, at law or in equity, as this Court may deem just and proper.

Dated: April 13, 2017

*/s/ John E. Haller*

John E. Haller                              (79549)
SHUMAKER, LOOP & KENDRICK, LLP
41 South High Street, Suite 2400
Columbus, OH 43215
Tel:  614.463.9441
Fax:  614.463.1108
jhaller@slk-law.com

*/s/ David H. Conaway*

David H. Conaway        (N.C. Bar No. 10648)
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon Street, Suite 2200
Charlotte, NC 28280
Tel:  704.375.0057
Fax:  704.332.1197
dconaway@slk-law.com

*Counsel for Electrolux Home Products, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2017, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties registered to receive electronic notices through the Court's CM/ECF system. Parties may access this filing through the Court's PACER system. In addition, counsel for hhgregg, Gregg, HHG, Wells Fargo, Gordon Brothers and Hilco will be served with a summons and, in addition, the undersigned has served each party at the following email addresses:

hhgregg, Gregg and HHG:                          Wells Fargo:

Jeffrey A Hokanson (jeff.hokanson@icemiller.com)   John F. Ventola (jventola@choate.com)
Sarah Lynn Fowler (Sarah.Fowler@icemiller.com)
Neil E. Herman (neil.herman@morganlewis.com)
Rachel Jaffe Mauceri (rachel.mauceri@morganlewis.com)


Hilco:                                           Gordon Brothers:

Timothy Bow (timothy.bow@kirkland.com)           Michael Chartock (mchartock@gordonbrothers.com)




                                                 */s/ John E. Haller*
                                                 _____
                                                 John E. Haller

SLK_CHA-#60127

# EXHIBIT A

# CONSIGNMENT AGREEMENT

THIS CONSIGNMENT AGREEMENT (this "Agreement") is made as of the 22nd day of March, 2011 by and between **ELECTROLUX HOME PRODUCTS, INC.**, a Delaware corporation, having a place of business at 10200 David Taylor Drive, Charlotte, NC 28262-8020 (the "Consignor") and Gregg Appliances, Inc., an Indiana corporation having a place of business at 4151 E. 96th Street, Indianapolis, Indiana 46240 (the "Consignee").

## WITNESSETH:

1. The Consignor shall deliver on consignment to the Consignee; all items set forth on Exhibit "A" attached hereto and incorporated herein (the "Consigned Merchandise") in amounts determined by Consignor in consultation with the consignee. The Consignment Merchandise shall be readily identifiable and distinguishable from the inventory owned by the Consignee.

2. The Consignor shall at all times retain title to all Consigned Merchandise. Upon the sale of the Consigned Merchandise; title to the proceeds shall vest in and remain the property of the Consignor until the Consignor is paid in full pursuant to the terms of this Agreement. The Consignee agrees to hold the Consigned Merchandise in trust for the Consignor as Consignor's property, for the sole purpose of selling the Consigned Merchandise and the Consigned Merchandise shall only be sold by the Consignee in its ordinary course of business. The Consigned Merchandise shall at all times be subject to the direction and control of the Consignor, and upon demand by the Consignor, the Consignee shall return any unsold Consigned Merchandise to the Consignor.

3. The Consignee represents and warrants to Consignor that:

    (a) All Consigned Merchandise shall only be sold (which may include sales occurring via the web) at the Consignee's stores and warehouses located on Exhibit "B" attached hereto and incorporated herein (collectively, the "Locations"). Consignee agrees not to relocate the Consigned Merchandise to locations other than the Locations without Consignor's prior written consent. Consignee shall provide Consignor prompt written notice of any new or deleted Consignee Locations, including temporary/seasonal storage.

    (b) The Consignee agrees that the Consignee shall take all steps and do all necessary things to protect such Consigned Merchandise. All Consigned Merchandise shall be inventoried with records separately showing title of the Consignor.

    (c) The Consignee shall obtain such insurance (by such carriers and in such amounts as reasonably acceptable to Consignor) to cover the Consigned Merchandise, including, but not limited to, fire, theft, water damage, extended coverage, as well as insurance to cover loss by virtue of riot or civil disobedience. The Consignee shall pay all premiums for such insurance and shall provide the Consignor with a certificate of insurance indicating such coverage exists and naming Consignor as additional insured with a loss payable to Consignor provision. If the Consignee does not obtain such insurance, the consignor, at its option, may terminate this Agreement, or in the alternative, at its sole option, may secure such insurance and the Consignee agrees to reimburse the Consignor for any and all premiums relating thereto, upon presentation of the Consignor's statement for same. The Consignor's failure to obtain such insurance shall in no way relieve the Consignee of its obligations to pay in full for all lost, stolen or damaged goods not previously paid by it to Consignor.

    (d) The Consigned Merchandise is and will be used in Consignee's business and not for personal, family, or household use.

    (e) The Consigned Merchandise shall remain free and clear of all liens, security interest, claims, and encumbrances.

    (f) None of the Consigned Merchandise is subject to any lien, encumbrances, security interests, or claims.

1

(g)    None of Consignee's inventory (as such term is defined in the Uniform Commercial Code) is subject to any lien, encumbrances, security interests, or claims except as set forth in Exhibit "C" attached hereto and incorporated herein.

(h)    Consignee will not assign, sell, mortgage, lease, transfer, pledge, grant a security interest in or lien upon, encumber, or otherwise dispose of or abandon, nor will Consignee suffer or permit any of the same to occur with respect to any part or all of the Consigned Merchandise, without prior written consent of Consignor, except for the sale in the ordinary course of business of Consignee of Consigned Merchandise, and the inclusion of "proceeds" of the Consigned Merchandise under this Agreement shall not be deemed a consent by Consignor to any or other disposition of any part or all of the Consigned Merchandise except as expressly permitted herein.

(i)    Consignee has made, and will continue to make payments, when due, of all taxes, assessments or contributions required by law which have been or may be levied or assessed against the Consignee, whether with respect to any of the Consigned Merchandise, inventory or to any wages or salaries of Consignee's employees, or otherwise, and will deliver to Consignor, on demand, certificates or other evidence satisfactory to Consignor attesting thereto.

(j)    Consignee will use the Consigned Merchandise for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations.

(k)    Consignee will keep the Consigned Merchandise in first-class order and marketable condition, at Consignee's own cost and expense.

(l)    After receipt of the Consigned Merchandise, Consignee shall pay all expenses with respect to the Consigned Merchandise including, but not limited to, all expenses of storage, insurance, selling, and delivering Consigned Merchandise to customers, and all taxes which may be assessed or levied on the Consigned Merchandise.

(m)    Consignee shall use its best efforts to promote, maintain and increase the sales of the Consigned Merchandise in the ordinary course of Consignee's business.

(n)    Consignee shall advertise and promote the Consigned Merchandise according to merchandising principles that emphasize the value and quality of the Consigned Merchandise and foster the good will of Consignee's customers with respect to the Consigned Merchandise.

(o)    Consignee shall maintain an attractive display of current Consigned Merchandise adequately installed, as specified in Consignor's installation instruction.

(p)    Consignee shall maintain a credit rating acceptable to Consignor.

(q)    Consignee shall keep Consignor's printed warranty and other customer literature package with the Consigned Merchandise.

(r)    Consignee shall protect the confidentiality of price sheets and such other information that Consignor marks as "Confidential";

(s)    Consignee shall collect from purchasers all applicable sales taxes imposed on the Consigned Merchandise; and

(t)    Consignee shall meet or exceed the "Performance Metrics" established by Consignor and attached and incorporated herein as Exhibit D.

4.    Upon the termination of this Agreement or at any time prior thereto in the sole discretion of Consignor, the Consignee shall take all steps reasonably requested by Consignor to afford the Consignor the immediate right to remove from the Locations all Consigned Merchandise, and all monies due to the Consignor from the Consignee shall be immediately due and payable.

{E0108169.4 }

2

5.   In order to secure Consignor with respect to the Consigned Merchandise and any and all monies due to the Consignor herein, the Consignee and its officers and directors agree to execute all documents reasonably required by Consignor and to execute and/or permit to be filed any and all such documents (including UCC-1 Financing Statements) reasonably necessary to be filed in order to perfect the Consignor's ownership interest in the Consigned Merchandise and the proceeds thereof.

6.   The Consignee also agrees to (i) keep the Consigned Merchandise, and the proceeds from the sales thereof, separate and capable of identification, as the property of the Consignor, (ii) report to the Consignor sales of the Consigned Merchandise as provided for in section 7 below, and (iii) furnish the Consignor on demand a true and complete report of the Consignee's sales of Consigned Merchandise for any period of time stated by the Consignor.

7.

(a)   On every Tuesday (for all sales for the previous week ending Sunday), Consignee shall send a written report to Consignor setting forth the sales of Consigned Merchandise, by model and location (the "Report"). Within one (1) day from the date of each Report, Consignee shall make payment to Consignor, via Consignor's designated on-line payment system for Consignees, in an amount equal to the Consigned Merchandise Cost (as defined herein). As used herein, the term "Consigned Merchandise Cost" shall mean the sum of (i) the Consigned Merchandise prices as set by Consignor and (ii) shipping costs. The Consigned Merchandise Cost shall be at the current established price.

(b)   Within three (3) business days of the end of each calendar month, Consignee shall send a written report to Consignor summarizing the value of the unsold Consigned Merchandise in Consignee's possession by Location. In the event that Consignee's aggregate balance of Consigned Merchandise is less than Consignee's aggregate open invoice balance as prepared by Consignor, or any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor, via Consignor's designated on-line payment system, the Consigned Merchandise Cost for such shortfall within seven (7) days of the date of such report. In addition, in the event that such report discloses that the aggregate balance of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor.

(c)   Consignee shall take a physical inventory of Consigned Merchandise at Consignee's expense no less than (2) times per calendar year and shall give reasonable notification to Consignor prior to the taking of such physical inventory. Consignor reserves the right to have a representative present at the time of the taking of such physical inventory. In the event that any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor the Consigned Merchandise Cost for such items of missing Consigned Merchandise within seven (7) days of the date of each inventory taking. In addition, in the event that such inventory taking discloses that the aggregate amount of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor.

(d)   At such other times as Consignor deems necessary, Consignor shall have the right to conduct a physical inventory of Consigned Merchandise at Consignor's expense, including inspection of all relevant books and records of Consignee whether electronic or manual or both, upon reasonable prior notice. Consignee reserves the right to have a representative present at the time of the taking of such physical inventory and/or inspection. In the event that Consignee's aggregate balance of Consigned Merchandise is less than Consignee's aggregate open invoice balance as prepared by Consignor, or any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor the Consigned Merchandise Cost for such shortfall within seven (7) days of the date of such inventory taking. In addition, in the event that such inventory taking discloses that the aggregate balance of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor.

8.   Upon Consignee's request, or as required by law, or ordered by any government, legislative, Consumer Product Safety Commission or other governmental, legislative, executive or judicial body or agency, Consignor shall provide Consignee with information sufficient to notify Consignee and its customers regarding product related issues, including, but not limited to, any defects with respect to the Consigned Merchandise. Consignor shall be

{E0108169.5 }

3

solely responsible for and shall immediately pay when due, any costs and expenses incurred by Consignee arising out of or in connection with the recall or removal of any Consigned Merchandise from the market place, whether said recall is voluntary or under compulsion from any governmental, legislative, executive or judicial body or agency.

9.   Notwithstanding anything to the contrary contained herein, Consignee shall be responsible to and shall reimburse Consignor for all losses and expenses to Consignor resulting from theft of, damage to or destruction of any of the Consigned Merchandise while in the possession of Consignee, or from levy or attachment by any process or lien thereon while in Consignee's possession.

10.  It is understood that the Consignor has no responsibility for any expenses of the operation of the Locations or the business of the Consignee. In that regard, Consignee shall conduct the entire business of selling the Consigned Merchandise in Consignee's name and at Consignee's cost and expense. Nothing in this Agreement shall authorize or empower Consignee to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of Consignor, or to bind Consignor in any manner, or make any representation, warranty or commitment on behalf of Consignor.

11.  In the event that there is a casualty loss with respect to any of the Consigned Merchandise, the Consignor shall be allowed to retain from the proceeds of insurance (as described in section 3 (c) above) an amount equal to the Consigned Merchandise Cost with respect to such Consigned Merchandise subject to a casualty loss.

12.  Either party may terminate this Agreement without cause, by giving a thirty (30) day prior written notice. Upon termination of this Agreement, Consignee shall immediately:

    (a)   Pay Consignor an amount equal to the aggregate Consigned Merchandise Cost of all Consigned Merchandise sold to the extent not previously paid; and

    (b)   Either (i) return unsold Consigned Merchandise to Consignor or (ii) purchase such unsold Consigned Merchandise in an amount equal to the aggregate Consigned Merchandise Cost of such Consigned Merchandise.

13.  The following shall each constitute a default by the Consignee (an "Event of Default"):

    (a)   False or misleading representations or warranties made or given by Consignee in connection with this Agreement;

    (b)   Subjection of the Consigned Merchandise to a lien, charge, encumbrance, levy or an execution or other judicial process;

    (c)   The commencement by Consignee of a bankruptcy proceeding, or Consignee has a bankruptcy proceeding commenced against it.

    (d)   Consignee fails to make any payments to Consignor under this Agreement within three (3) days when due.

    (e)   Consignee files an assignment for the benefit of creditors;

    (f)   Consignee has a receiver appointed over most of its assets;

    (g)   Consignee is in default of any term, covenant or condition of this Agreement;

    (h)   Consignee, its employees or agents make derogatory or deceptive statements about Consignor or the Consigned Merchandise;

    (i)   Consignee trans-ships any Consigned Merchandise to any party;

    (j)   Consignee submits false or fraudulent reports to Consignor;

4

(k)     Consignee ceases to function as a going concern or ceases to conduct its operations as a retail dealer continuously and actively;

(l)     Consignee fails to meet or exceed the Performance Metrics; and

(m)     Consignee relocates Consigned Merchandise to a location other than the Locations listed on Exhibit B without the prior written consent of Consignor.

14.     Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default, (i) Consignor shall have the right to immediately terminate this Agreement without notice to Consignee and Consignor shall have all rights afforded under the law for damages against Consignee, (ii) at the option of the Consignor, all amounts due from Consignee under this Agreement shall immediately become due and payable in full without notice or demand; and (iii) the Consignor shall have all rights and remedies afforded under this Agreement, the Uniform Commercial Code or applicable law for damages, including but not limited to, all right, remedies and privileges with respect to (1) repossession, retention and/or sale of the Consigned Merchandise and the retention of the proceeds thereof, and (2) the applicable sections of the Uniform Commercial Code as adopted in the State of New York respecting "default", in effect as of the date of this Agreement.

15.     If an Event of Default occurs, the Consignor's reasonable attorneys' fees and the legal and other expenses for enforcing the terms of this Agreement shall be chargeable to and payable by the Consignee.

16.     Upon the occurrence of an Event of Default, in conjunction with and in addition to the rights of Consignor as set forth in this Agreement, the Consignor, at its discretion, and to the extent permitted by applicable law, may enter any of the locations where the Consigned Merchandise is located by Consignor's own means or with legal process and take possession of the Consigned Merchandise and the Consignee agrees not to resist or interfere.

17.     If the Consignee shall default in the performance of any of the provisions of this Agreement on the Consignee's part to be performed, the Consignor may, but is not obligated to, perform same for the Consignee's account and any monies expended in so doing shall be chargeable with interest (at the rate of 12% per annum) to the Consignee.

18.     Provided that no Event of Default has occurred, Consignor and Consignee may agree to extend the term of this Agreement. If Consignor agrees to extend the term of this Agreement, Consignee shall execute all documents reasonably requested by Consignor.

19.

(a)     All communications and notices under this Agreement shall be in writing and shall be sent as follows:

If to Consignor at the following address, or at such other address as may have been furnished in writing to Consignee:

            Electrolux Home Products, Inc.
            10200 David Taylor Drive
            Charlotte, NC 28262-8020
            Attn: Director of Credit Management

With a copy to:

            Electrolux Home Products, Inc.
            10200 David Taylor Drive
            Charlotte, NC 28262-8020
            Attn: Legal Department – Legal Notice

{E0103169.4 }

5

If to Consignee, at the following address, or at such other address as may have been furnished in writing to Consignor:

Gregg Appliances, Inc.
4151 E 96th St.
Indianapolis, IN 46240
Attn: Legal Department

(b) Any notice shall be addressed and mailed postage prepaid by registered or certified mail, delivered by hand, or sent by nationally recognized overnight delivery service with next business day delivery. Such notices shall be deemed to be given and received on the date delivered by hand, on the next business day after being sent by nationally recognized overnight delivery service or on the fifth (5) day after sent by registered or certified mail, as the case may be.

20. Consignee, its successors and assigns, shall hold harmless, indemnify and defend Consignor and Consignor's agents, officers, directors, shareholders and employees from and against any and all claims, liabilities, losses, suits, actions, costs, expenses, damages and fees (including attorneys fees) of any kind or nature arising out of or resulting in any way from acts or omissions of Consignee or its employees, agents or representatives which are not authorized by this Agreement.

21. The relationship established under this Agreement is non-exclusive. Consignor reserves the right to enter into any agreement with any other party as Consignor may select from time to time with respect to the sale or distribution of Consigned Merchandise.

22. Consignor and Consignee agree that this Agreement and its terms and conditions are confidential and are not to be disclosed or publicly disseminated. Consignor and Consignee agree to use reasonable efforts to ensure that confidentiality and non-disclosure is maintained with respect to this Agreement provided, that, this Agreement may be disclosed if required by applicable court order.

23. This Agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, and their respective representatives, successors and assigns provided, that, Consignee shall not have the right to assign this Agreement without first obtaining the express written consent of Consignor.

24. The gender and number used in this Agreement are used as a reference term only and shall apply with the same effect whether the parties are of the masculine or feminine gender, corporate or other form, and the singular shall likewise include the plural.

25. The Consignee shall make the Locations, the Consigned Merchandise and Consignee's books and records available to a representative of the Consignor for inspection during regular business hours.

26. This Agreement represents the entire agreement between the parties hereto and supersedes any prior understanding, communication, agreement or representation whether oral or in writing.

27. The Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina applicable to contracts made and to be performed wholly within that state. If any provision of this Agreement is held to be illegal or unenforceable for any reason whatsoever, such illegality or unenforceable shall not affect the validity of any other provision hereof.

28. This Agreement may not be changed orally but only in writing executed by the Consignee and the Consignor.

29. Interest shall accrue at the rate of 12% per annum on all unpaid amounts due Consignor under this Agreement after the due date.

30. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same Agreement.

{E0108169.4}

6

IN WITNESS WHEREOF, the parties have respectively signed and sealed these presents the day and year first above written.

Gregg Appliances, Inc.

By: _____
Authorized Signatory   SECRETARY

ELECTROLUX HOME PRODUCTS, INC.

By: _____
Authorized Signatory

# EXHIBIT B



### SHUMAKER®
Shumaker, Loop & Kendrick, LLP

101 South Tryon Street          704.375.0057
Suite 2200                            704.332.1197 fax
Charlotte, North Carolina 28280

www.slk-law.com

DAVID H. CONAWAY
704.945.2149
dconaway@slk-law.com

March 24, 2017

VIA FAX, EMAIL and
FEDEX

hhgregg, Inc. Proposed Claims Agent
c/o Donlin, Recano & Company, Inc.
Re: hhgregg, Inc., et al.
6201 15th Avenue
Brooklyn, NY 11219
212.481.1416 (fax)
hhgregginfo@donlinrecano.com

hhgregg, Inc., Gregg Appliances, Inc., and
HHG Distributing LLC
Attn: Candace Bankovich, VP, General
Counsel
4151 East 96th Street
Indianapolis, IN 46240
Candace.bankovich@hhgregg.com

Ice Miller LLP
Attn: Jeffrey A. Hokanson
One American Square, Suite 2900
Indianapolis, IN 46282-0200
317.236.2219 (fax)
Jeff.Hokanson@icemiller.com

Morgan, Lewis & Bockius LLP
Attn: Neil E. Herman
101 Park Avenue
New York, NY 10178
212.309.6001 (fax)
Neil.Herman@morganlewis.com

Re:    In re hhgregg, Inc., et al.; Case No. 17-01302-RLM
       (Bankr. Southern District of Indiana)

This is in connection with the above-referenced jointly administered bankruptcy case(s) (the "Bankruptcy Case(s)") of debtors hhgregg, Inc., Gregg Appliances, Inc. and HHG Distributing LLC ("Debtors"). As set forth in Electrolux's Verified Complaint for Declaratory and Other Relief filed on March 20, 2017, and in other pleadings of record filed by Electrolux in this case, Electrolux asserts ownership in all inventory delivered to the Debtors. Solely for the purposes of preserving and reserving its rights, Electrolux submits this demand, pursuant to section 2-702(2) of the applicable Uniform Commercial Code, section 546 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), and other applicable law, for reclamation of Electrolux's inventory delivered to the Debtors within forty-five (45) days of commencement of the Bankruptcy Case(s), as detailed in the Electrolux's and the Debtors' books and records (the "Inventory").

Debtors may have also made representations of solvency to Electrolux within three months before delivery of the Inventory, thereby entitling Electrolux to additional reclamation

CHARLOTTE | COLUMBUS | SARASOTA | TAMPA | TOLEDO

March 24, 2017
Page 2

rights under the applicable Uniform Commercial Code.  Electrolux expressly retains any and all such additional rights of reclamation.

This demand is given for notice purposes only, and solely as a reservation of rights and Electrolux reserves the right to amend, supplement or withdraw this demand.

Very truly yours,

David H. Conaway

DHC:cpe