**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re:<br><br>hhgregg, Inc., *et al.*,<br><br>         Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>) |
| | Chapter 11<br>Case No. 17-01302-RLM-11 |
| Electrolux Home Products, Inc.,<br><br>         Plaintiff,<br><br>v.<br><br>hhgregg, Inc., HHG Distributing LLC, Gregg Appliances, Inc., Wells Fargo Bank, National Association, Hilco Merchant Resources, LLC, and Gordon Brothers Retail Partners, LLC,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | Adversary Proceeding No. 17-50098-RLM |

**DEFENDANT WELLS FARGO BANK, NATIONAL ASSOCIATION'S
ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY AND OTHER RELIEF AND
COUNTERCLAIM AGAINST ELECTROLUX HOME PRODUCTS, INC.**

Defendant Wells Fargo Bank, National Association ("Wells Fargo") hereby answers Electrolux Home Products, Inc.'s First Amended Complaint for Declaratory and Other Relief [Doc. No. 72], denying each and every allegation not specifically admitted, and, without assuming any burden of proof that would otherwise not be placed on Wells Fargo by laws, averring separate defenses as follows:

## JURISDICTION AND VENUE[1]

1.      This Court has exclusive jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

ANSWER:  Wells Fargo does not contest jurisdiction.

2.      This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K), (N), and (O).

ANSWER:  Wells Fargo does not contest Plaintiff's assertion that this action constitutes a core proceeding within the meaning of 28 U.S.C. § 157.

3.      This is an action for declaratory relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. §§ 105 and 541, Rule 57 of the Federal Rules of Civil Procedure, and Rule 7001(9) of the Federal Rules of Bankruptcy Procedure.

ANSWER:  Admitted that Plaintiff appears to seek the relief set forth in Paragraph 3, but denies that Plaintiff is entitled to any relief.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

ANSWER:  Wells Fargo does not contest venue.

5.      In accordance with the Federal Rule of Bankruptcy Procedure 7012(b), the Plaintiff consents to entry of final orders and judgment by the Court in connection with the claims asserted herein to the extent that it is later determined that the Court, absent consent of the Plaintiff, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

ANSWER:  In accordance with Federal Rule of Bankruptcy Procedure 7012(b), Wells Fargo also consents to the issuance of final orders and judgment by the Court.

---

[1]      Wells Fargo repeats certain of the headings used by Plaintiff for ease of reference. In so doing, Wells Fargo does not admit or agree, and expressly denies, the characterizations in Plaintiff's headings.

## THE PARTIES

6.    Electrolux is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Electrolux is a party in interest within the meaning of 11 U.S.C. § 1109(b) and therefore has the requisite standing to assert these claims against the Defendants.

ANSWER: Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and therefore denies same.

7.    Gregg, hhgregg, Inc., and HHG Distributing LLC are the Debtors herein and are organized under the laws of the State of Indiana.

ANSWER: Admitted that hhgregg, Inc. ("hhgregg"), Gregg Appliances, Inc. ("Gregg"), and HHG Distributing LLC ("HHG," and with hhgregg and Gregg, the "Debtors") are the debtors in the jointly administered Chapter 11 proceeding pending in this Court with lead Case No. 17-01302-11. Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 7, and therefore denies same.

8.    Wells Fargo is a national association bank with its principal place of business in Sioux Falls, South Dakota. Wells Fargo is a defendant herein in its capacity as the Administrative Agent and the Collateral Agent for the Prepetition Credit Agreement (as defined below) and for the DIP Credit Agreement (as defined below).

ANSWER: Admitted that Wells Fargo is a nationally chartered bank with its principal place of business in Sioux Falls, South Dakota, and that Plaintiff purports to assert claims against Wells Fargo in its capacity as Administrative Agent and Collateral Agent of the Amended and Restated Loan Agreement dated March 29, 2011 and entered into by, among others, Gregg, HHG, and Wells Fargo (the "Prepetition Credit Agreement") and as Administrative Agent and Collateral Agent of the Debtor-in-Possession Loan and Security Agreement dated March 6, 2017 and

- 3 -

entered into by, among others, Gregg, HHG, hhgregg, and Wells Fargo (the "DIP Credit Agreement"), but otherwise denies that Plaintiff has alleged any valid claim against Wells Fargo.

9.      Hilco is an Illinois limited liability company.

ANSWER:  Paragraph 9 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies same.

10.      Gordon Brothers is a Massachusetts limited liability company.

ANSWER:  Paragraph 10 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies same.

11.      A Committee of Unsecured Creditors was appointed by order of the Court on March 10,  2017 [Docket No. 118].

ANSWER:  Admitted that the U.S. Trustee filed a Notice of Appointment of Unsecured Creditors' Committee on March 10, 2017 at Docket Number 118 in the Debtors' Chapter 11 proceeding.

## FACTUAL BACKGROUND

12.      On March 6, 2017, hhgregg, Inc., Gregg Appliances, Inc., and HHG Distributing LLC (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Southern District of Indiana (the "Court").   These bankruptcy

cases were administratively consolidated under case no. 17-01302 (this "Case") by order of the Court entered on March 13, 2017 [Docket No. 139].

ANSWER: Admitted.

13.    Gregg, pursuant to a Consignment Agreement dated March 11, 2011 (the "Consignment Agreement"), received certain goods on consignment from Electrolux (the "Electrolux Consignment Inventory"). A copy of the Consignment Agreement is attached hereto as Exhibit A.

ANSWER: Admitted that a copy of a Consignment Agreement entered into among Plaintiff and Gregg and dated March 22, 2011 is attached as Exhibit A to the First Amended Complaint (the "Consignment Agreement"). Wells Fargo is without knowledge or information sufficient to form a belief as to whether the Consignment Agreement is a true, correct, and complete copy of the agreement entered into between Plaintiff and Gregg, and as to the truth of the remaining allegations in Paragraph 13, and therefore denies same.

14.    The Electrolux Consignment Inventory primarily consists of branded appliances, including Electrolux, Electrolux ICON, Gibson, Kelvinator, Tappan, and Frigidaire brand refrigerators, freezers, clothes washers, clothes dryers, ranges, stoves, cook tops, dishwashers, and other kinds of household and commercial appliances.

ANSWER: Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore denies same.

15.    Pursuant to the Consignment Agreement, Electrolux periodically delivered Electrolux Consignment Inventory to Gregg's store locations and distribution centers across the country, and all of the Electrolux Consignment Inventory was delivered to Gregg as consigned goods pursuant to the Consignment Agreement.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore denies same.

16.    At all times during their consignment relationship, and as expressly provided in the  Consignment Agreement, Gregg and Electrolux acknowledged and agreed that all right, title, and interest in and to all of the Electrolux Consignment Inventory remained with Electrolux and  never transferred to Gregg.

ANSWER: Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore denies same.

17.    The Consignment Agreement expressly provides with regard to title to the Electrolux  Consignment Inventory and its proceeds:

> The Consignor shall at all times retain title to all Consigned Merchandise. Upon the  sale of the Consigned Merchandise; title to the proceeds shall vest in and remain the property of the Consignor until the Consignor is paid in full pursuant to the terms of this Agreement.  The Consignee agrees to hold the Consigned Merchandise in trust for the Consignor as Consignor's property, for the sole purpose of selling the Consigned Merchandise and the Consigned Merchandise shall only be sold by the Consignee in its ordinary course of business.  The Consigned Merchandise shall at all times be subject to the direction and control of the Consignor, and upon demand by the Consignor, the Consignee shall return any unsold Consigned  Merchandise to the Consignor.  ¶ 2.

> In order to secure Consignor with respect to the Consigned Merchandise and any and all moneys due to the Consignor herein, the Consignee * * *[agrees] * * * to execute and/or permit to be filed any * * * documents * * *to perfect the Consignor's ***ownership interest*** in the Consigned Merchandise and the proceeds thereof.  ¶ 5 (emphasis added).

ANSWER:   Admitted that the language excerpted in Paragraph 17 and subject to Plaintiff's alterations appears in the Consignment Agreement, but otherwise denied that the excerpt is a complete and accurate representation of the terms of the Consignment Agreement.

18.    The Consignment Agreement expressly provides with regard to identification and segregation of the Electrolux Consignment Inventory:

> The Consignment Merchandise shall be readily identifiable and distinguishable from the inventory owned by the Consignee. ¶ 1.
>
> The Consigned Merchandise shall remain free and clear of all liens, security interest, claims, and encumbrances. ¶ 3(e).

ANSWER:  Admitted that the language excerpted in Paragraph 18 appears in the Consignment Agreement, but otherwise denied that the excerpt is a complete and accurate representation of the terms of the Consignment Agreement.

19.    The Consignment Agreement further provides with regard to payment to Electrolux by Gregg:

> On every Tuesday (for all sales for the previous week ending Sunday), Consignee shall send a written report to Consignor setting forth the sales of Consigned Merchandise, by model and location (the "Report").  Within one (1) day from the date of each Report, Consignee shall make payment to Consignor, via Consignor's designated on-line payment system for Consignees, in an amount equal to the Consigned Merchandise Cost (as defined herein).  As used herein, the term "Consigned Merchandise Cost" shall mean the sum of (i) the Consigned Merchandise prices as set by Consignor and (ii) shipping costs.  The Consigned Merchandise Cost shall be at the current established price. ¶ 7(a).
>
> Within three (3) business days of the end of each calendar month, Consignee shall send a written report to Consignor summarizing the value of the unsold Consigned Merchandise in Consignee's possession by Location.  In the event that Consignee's aggregate balance of Consigned Merchandise is less than Consignee's aggregate open invoice balance as prepared by Consignor, or any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor, via Consignor's designated on-line payment system, the Consigned Merchandise Cost for such shortfall within seven (7) days of the date of such report.  In addition, in the event that such report discloses that the aggregate balance of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor. ¶ 7(b).

ANSWER:  Admitted that the language excerpted in Paragraph 19 appears in the Consignment Agreement, but otherwise denied that the excerpt is a complete and accurate representation of the terms of the Consignment Agreement.

20.    For all of the reasons set forth above, and additional reasons, Electrolux has at all times  been, and remains, the owner of all Electrolux Consignment Inventory while it is in the possession of Gregg, and all proceeds of the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 20 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 20 are denied.

21.    For all of the reasons set forth above, and additional reasons, the Consignment Agreement is a true consignment and is not a security or financing agreement.

ANSWER:  The allegations in Paragraph 21 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 21 are denied.

22.    The Consignment Agreement does not require Electrolux to deliver any of Electrolux's  branded products to Gregg, and at any time Electrolux is entitled to stop providing Electrolux's  branded products to Gregg and end the Consignment Agreement.  ¶¶ 1 and 2.

ANSWER:  The allegations in Paragraph 22 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 22 are denied.

23.    The Consignment Agreement requires Gregg to return the Electrolux Consignment  Inventory upon demand by Electrolux.  ¶¶ 2 and 4.

ANSWER:  The allegations in Paragraph 23 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 23 are denied.

24.    The Consignment Agreement provides that the Electrolux Consignment Inventory shall only be sold in the ordinary course of business and does not allow sale of the Electrolux Consignment Inventory in a liquidation or going out of business sale.  ¶¶ 2.

ANSWER:  The allegations in Paragraph 24 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 24 are denied.

25.    The Consignment Agreement prohibits any relocation of the Electrolux Consignment Inventory without Electrolux's prior written consent. ¶ 3(a).

ANSWER:  The allegations in Paragraph 25 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 25 are denied.

26.    The Consignment Agreement provides that Gregg holds the Electrolux Consignment Inventory and proceeds in trust for purposes of fulfilling the terms of the Consignment Agreement, namely the sale of the Electrolux Consignment Inventory and remittance of proceeds to Electrolux. ¶ 4.

ANSWER:  The allegations in Paragraph 26 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 26 are denied.

27.    The Consignment Agreement is governed by North Carolina law applicable to contracts made and to be performed wholly within that state. ¶ 27.

ANSWER:  The allegations in Paragraph 27 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 27 are denied.

28.    On March 7, 2017, the Debtors filed a *Debtors' Motion for Interim and Final Orders (I)  Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§  105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders  Pursuant to 11 U.S.C.  §§ 364 and 507;  (III)  Authorizing the  Use  of  Cash Collateral and  Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay  Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* [Docket No. 18] in this Case (the  "DIP Motion").

ANSWER:  Admitted that on March 7, 2017, the Debtors filed a *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash  Collateral  and  Providing  Adequate  Protection  to  Prepetition  Secured  Parties  and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* at Docket Number 18 in the Debtors' Chapter 11 proceeding (the "DIP Motion").

29.    Attached to the DIP Motion as Exhibit B is a proposed Debtor in Possession Credit  Agreement (the "DIP Credit Agreement").

ANSWER:  Admitted.

30.     Through numerous provisions, the DIP Credit Agreement assiduously and expressly makes it clear that the DIP Credit Agreement does not have the effect of granting a postpetition security interest in or lien upon any of the Electrolux Consignment Inventory that would have priority over Electrolux's interest in the Electrolux Consignment Inventory:

> a.  The definition of Eligible Commercial Accounts (for use in calculating the Borrowing Base) excludes accounts that arise from sales on consignment. ¶ 1.60(d).
>
> b.  The definition of Eligible Credit Card Receivables (for use in calculating the Borrowing Base) excludes receivables that arise from sales on consignment. ¶ 1.61(b).
>
> c.  The definition of Eligible Inventory (for use in calculating the Borrowing Base) excludes inventory that is "purchased or sold on consignment, including without limitation, Frigidaire Consignment Collateral * * *." ¶ 1.63(l).
>
> d.  By definition, "Frigidaire Consignment Collateral" means all inventory manufactured or distributed by Electrolux, and "Frigidaire" means Electrolux. ¶¶ 1.93 and 1.95 and Schedule 1.C.
>
> e.  By definition, "Frigidaire Consignment Agreement" means the Consignment Agreement, dated September 24, 2003, by and between Frigidaire and Gregg with respect to certain inventory manufactured by Frigidaire and sold by Gregg, "as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced." ¶ 1.94.

ANSWER:  Admitted that the language quoted in Paragraph 30 appears in the DIP Credit Agreement, but otherwise denied that the quoted language is a complete and accurate representation of the terms of the DIP Credit Agreement.  Otherwise the allegations in Paragraph 30 state legal conclusions to which no response is required.  To the extent a response is deemed required, the other allegations in Paragraph 30 are denied.

31.     The Consignment Agreement *is* a renewal, restatement, or replacement of the Frigidaire Consignment Agreement.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies same.

32.    Therefore, the DIP Credit Agreement expressly excludes granting a postpetition security interest in or lien upon any of the Electrolux Consignment Inventory and proceeds that would have the effect of having priority over Electrolux's interest in the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 32 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 32 are denied.

33.    On March 7, 2017, the Court entered its *Interim Order (I) Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§  364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361,  362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B)  and (C) and Local Rule 4001-2* [Docket No. 50] in this Case (the "Interim DIP Order").

ANSWER:  Admitted that on March 7, 2017, the Court entered its *Interim Order (I) Authorizing Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy*

*Rules 4001(B) and (C) and Local Rule 4001-2* at Docket Number 50 in the Debtors' Chapter 11 proceeding (the "Interim DIP Order").

34.    The Interim DIP Order approved the DIP Credit Agreement on an interim basis.

ANSWER:  Admitted.

35.    At the "first day" hearing on March 7, 2017, the Debtors' counsel, in arguing for the granting of the DIP Motion and the other first day motions, represented to the Court that Electrolux was a major consignment vendor of the Debtors and was essential to the Debtors' ongoing business operations, the Chapter 11 cases, and a successful reorganization.

ANSWER:  Admitted that during the "first day" hearing on March 7, 2017 in the Debtors' Chapter 11 proceeding, Debtors' counsel represented to the Court the Plaintiff is one of two "major consignment vendor suppliers," but denied as to the other allegations in Paragraph 35.

36.    The Debtors are parties to that certain Amended and Restated Loan and Security Agreement dated as of March 29, 2011 (collectively with all amendments thereto, the "Prepetition Credit Agreement"), by and among Gregg, as borrower, and Wells Fargo as administrative agent and collateral agent for the Prepetition Secured Parties, as that term is defined in the DIP Credit Agreement.

ANSWER:  Denied that hhgregg is a party to the Prepetition Credit Agreement, but admitted as to the other allegations in Paragraph 36.

37.    On information and belief, the Prepetition Credit Agreement was in part the model for  the DIP Credit Agreement, and the Prepetition Credit Agreement also expressly excludes the  granting of any security interest in the prepetition Electrolux Consignment Inventory that would  have the effect of having priority over Electrolux's interest in the

Electrolux Consignment Inventory. Specifically, the Prepetition Credit Agreement provides as follows:

a. 1.44 "Eligible Inventory" excludes "Inventory purchased or sold on consignment, including without limitation, Frigidaire Consignment Collateral * * * "

b. 7.1(a)(i) <u>Collateral Reporting</u> requires the Debtors to provide weekly and monthly reports (C) inventory reports by categories, location and mix (including indicating the amounts of Inventory at warehouses and stores, and detail regarding Inventory subject to the Frigidaire Consignment Agreement) ** *."

c. 7.1(a)(iii) <u>Collateral Reporting</u> requires the Debtors to provide monthly "reports regarding the inventory subject to the Frigidaire Consignment Agreement.

d. 10.1(i) <u>Events of Default</u> includes defaults under "Material Contracts" including the "Frigidaire Consignment Agreement."

ANSWER: Admitted that the language quoted in Paragraph 37 appears in the Prepetition Credit Agreement, but otherwise denied that the quoted language is a complete and accurate representation of the terms of the Prepetition Credit Agreement. Otherwise the allegations in Paragraph 37 state legal conclusions to which no response is required. To the extent a response is deemed required, the other allegations in Paragraph 37 are denied.

38. The Consignment Agreement between Electrolux and Gregg provides that Electrolux "shall at all times retain title to all Consigned Merchandise." Thus, pursuant to the terms of the Consignment Agreement, the Electrolux Consignment Inventory was never "owned" nor "hereafter acquired" by Gregg. Instead, the Electrolux Consignment Inventory was, at all times prior to sale to a Gregg customer, owned by Electrolux.

ANSWER: Admitted that the language excerpted in Paragraph 38 appears in the Consignment Agreement, but otherwise denied that the excerpt is a complete and accurate representation of the terms of the Consignment Agreement. Otherwise the allegations in Paragraph 38 state legal

conclusions to which no response is required.  To the extent a response is deemed required, the other allegations in Paragraph 38 are denied.

39.    The Electrolux Consignment Inventory and proceeds are not owned by the Debtors, and  are expressly and specifically recognized in the DIP Credit Agreement as the property  of  Electrolux and not subject to any superior rights of the lenders.

ANSWER:  Denied.

40.    Pursuant to the Consignment Agreement, Gregg was obligated to make a payment to Electrolux on Wednesday, March 8, 2017, for Gregg's sales of Electrolux Consignment  Inventory during the previous seven-day period ending on March 5, 2017.  The amount that was due and owing to Electrolux and should have been paid by Gregg on March 8 was  not less than $2,046,717.87.   Gregg was further obligated to make a payment to Electrolux on Wednesday,  March 15, 2017, for Gregg's sales of Electrolux Consignment Inventory during the previous  seven-day period ending on March 12, 2017, which is in an unknown amount.  Since the Chapter 11 filing, through April 10, 2017, the amount unpaid, and due and owing to Electrolux, is $10,855,849.81.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore denies same.

41.    Despite demand by Electrolux, Gregg has failed and refused to make either of these  payments to Electrolux.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore denies same.

42.    By order entered on March 13, 2017 [Docket No. 137] (the "Interim Store Closing Order")., the Court granted on an interim basis the Debtors' first-day motion to continue their store-closing sales, which had commenced prepetition on March 3, 2017.

ANSWER:  Admitted that on March 13, 2017 the Court entered its *Interim Order Authorizing the Debtors to Continue the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances and Granting Related Relief (Doc. No. 14)* at Docket Number 137 in the Debtors' Chapter 11 proceeding (the "Interim Store Closing Order").

43.    Paragraph 23 of the Interim Store Closing Order allows the Debtors and the Consultant (as defined in the Store Closing Order) to sell "Merchandise" free and clear of liens and encumbrances, and directs the Debtors to use the proceeds of these sales to pay existing secured debt consistent with the Interim DIP Order and the DIP Credit Agreement.

ANSWER:  Admitted that Paragraph 23 of the Interim Store Closing Order authorizes the Consultant, as defined in the Interim Store Closing Order, to sell merchandise on behalf of the Debtors free and clear of certain encumbrances, and authorizes the Debtors to pay proceeds from sales to existing secured debt.  The remaining allegations in Paragraph 43 are broad generalizations that do not accurately reflect the terms of the Interim Store Closing Order, and are therefore denied.

44.    Paragraph 8 of the Interim Store Closing Order authorizes the Debtors to continue the Store Closing Sales "in accordance with this Interim Order, the Sale Guidelines, and the Agreement."  The Agreement is defined as the Consulting Agreement that is attached to that order as Exhibit 1.

ANSWER:  Admitted.

45.     In Section 2 of this Consulting Agreement, "Merchandise" is defined generally as all goods that are saleable in the ordinary course, but the definition excludes goods held on consignment, which are defined as "Consigned Goods." Consigned Goods, and some other goods excluded from the definition of "Merchandise," are collectively defined as the "Non-Merchandise Goods.

ANSWER:  Admitted that Section 2 of the Consulting Agreement, attached as Exhibit 1 to the Interim Store Closing Order (the "Consulting Agreement"), defines the term "Merchandise" to mean all goods saleable in the ordinary course, excluding a defined category "Consigned Goods" and other categories of goods that are collectively defined as "Non-Merchandise Goods;" however, the Consulting Agreement is in writing and speaks for itself, and all attempts to paraphrase or characterize the Consulting Agreement are denied.

46.     Section 6.d(ii) of the Consulting Agreement provides a fee schedule to be paid the Consultant from Gross Proceeds, but excludes "Gross Proceeds from Consigned Goods."    Immediately below this fee schedule, the Consulting Agreement states that "***Consultant shall  sell Non-Merchandise Goods*** during the Sale at the Stores, and in consideration of such services,   Consultant shall earn a fee equal to * * *." (emphasis added).

ANSWER:  Admitted that Section 6(ii) of the Consulting Agreement defines a fee schedule for the Consultant to be paid from gross proceeds of sales of goods, and that the fee schedule distinguishes fees to be paid from the gross proceeds from the sales of Merchandise, from the sales of Consigned Goods, and from the sales of Non-Merchandise Goods, as those terms are defined in the Consulting Agreement; however, the Consulting Agreement is in writing and speaks for itself, and all attempts to paraphrase or characterize the Consulting Agreement are denied.

47.    Therefore, the Consulting Agreement is subject to the interpretation of allowing the sale of Electrolux Consignment Inventory, and thus such sale could be allowed by the Interim Store Closing Order, and the proceeds of such sales of the Electrolux Consignment Inventory would under this interpretation be paid to Wells Fargo under the Interim DIP Order.

ANSWER:  The Consulting Agreement, the DIP Credit Agreement, the Interim DIP Order, and the Interim Store Closing Order are in writing and speak for themselves, and all attempts to paraphrase or characterize the Consulting Agreement, the DIP Credit Agreement, the Interim DIP Order, and the Interim Store Closing Order are denied.

48.    On information and belief, Gregg continues to sell the Electrolux Consignment Inventory, and Gregg has failed and refused to pay Electrolux any proceeds received from the sale of Electrolux Consignment Inventory.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, and therefore denies same.

49.    On April 7, 2017, the Court approved the Debtors' Phase II liquidation sale, and the Debtors continue to sell the Electrolux Consignment Inventory without paying Electrolux the  obligations owed to it.

ANSWER:  Admitted that on April 7, 2017 the Court entered its *Order (I) Authorizing the Debtors to Enter into the Consulting Agreement, (II) Authorizing and Approving the Conduct of Phase II Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief (Doc. No. 479)* at Docket Number 629 in the Debtors' Chapter 11 proceeding (the "Phase II Store Closing Order").  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49, and therefore denies same.

- 18 -

50.     On information and belief, the proceeds from the sale of Electrolux Consignment Inventory have not been segregated for Electrolux's benefit.   Rather, the proceeds have been commingled with Gregg's operating funds and are being paid to Wells and the other lenders  under the DIP Order.

ANSWER:  Admitted that proceeds from sales of goods made pursuant to the Interim Store Closing Order and the Phase II Store Closing Order have been paid to Wells Fargo in its capacity as Administrative Agent and Collateral Agent of the Prepetition Credit Agreement and the DIP Credit Agreement, in accordance with the Interim DIP Order and the Interim Cash Management Order (filed at Docket Number 52 in the Debtors' Chapter 11 proceeding), such that daily sales receipts are swept into one or more concentration accounts, which in turn are applied to pay down amounts outstanding under the credit agreements.   To the extent that there are any remaining allegations in Paragraph 50, they are denied.

51.     Gregg's actions stated above constitute a breach of its performance obligations under  the  Consignment  Agreement  and  a  default  under  and  breach  of  the  Consignment Agreement.   This default and breach materially prejudices the rights of Electrolux in and to the Electrolux  Consignment Inventory as provided in the Consignment Agreement.

ANSWER:   Paragraph  51  makes  no  allegations  regarding  Wells  Fargo,  and  further,  the allegations in Paragraph 51 state legal conclusions, and therefore no response is required.  To the extent a response is deemed required, the allegations in Paragraph 51 are denied.

52.     Section 10.1 of the DIP Credit Agreement lists Events of Default under that agreement.   Subsection  (f)(ii)  defines  one  of  the  Events  of  Default  as  "any  default  by Borrower  or  any  Obligor  under  any  Material  Contract  (including,  without  limitation,  any of  the  Credit  Card  Agreements or the Frigidaire Consignment Agreement) * * *."

ANSWER:  Admitted that Section 10.1 of the DIP Credit Agreement lists events of default under that agreement, and that Subsection 10.1(f)(ii) of the DIP Credit Agreement includes the language quoted in Paragraph 52; however the DIP Credit Agreement is in writing and speaks for itself, and all attempts to paraphrase or characterize the DIP Credit Agreement are denied.

53.    Therefore, Gregg's default under the Consignment Agreement comprises a default under the DIP Credit Agreement.

ANSWER:  The allegations in Paragraph 53 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 53 are denied.

54.    Unless Defendants Gregg, the Consultant and Wells Fargo are immediately enjoined,  Electrolux will suffer irreparable harm because:

    a.    The Debtors have and continue to dispose of Electrolux Consignment Inventory without permitting Electrolux to be fully and fairly heard on this issue in an Adversary Proceeding.  Any sale of the Electrolux Consignment Inventory prior to a determination of the Debtors' interest in such property is in direct violation of controlling precedent. *See SLW Capital, LLC v. Mansaray- Ruffin*, 530 F.2d 230, 237 (3rd. Cir. 2008); *See, i.e., SLW Capital, LLC v. Mansaray-Ruffin*, 530 F.2d 230, 237 (3rd. Cir. 2008); *In re Whitehall Jewelers*, No. 08-11261 (KG), 2008 Bankr. LEXIS 2120 (Bankr. D. Del. July 28, 2008.)

    b.    Debtors are seeking to liquidate all their assets on or before on or before April 25, 2017 pursuant to the Bidding Procedures Motion and the Hilco Motion.  As a result, there will be no determination of the Debtors' interest in the Electrolux Consignment Inventory prior to the Debtors' expedited sales in  these Chapter 11 Cases.

    c.    Debtors are selling Electrolux Consignment Inventory at discount prices,  without remitting any proceeds of sale to Electrolux, as required by the  Electrolux Consignment Agreement.

    d.    The Bidding Procedures Motion and the Hilco Motion seek to immediately  liquidate inventory in all of the Debtors' stores and sell such property free and clear of all liens, claims, encumbrances, and interests, and that the proceeds of  the sales will be paid to Wells Fargo.

e.  The DIP Motion seeks authority to grant first priority security interests in and liens on all assets of the Debtors, including all previously unencumbered assets.  To the extent the DIP Motion seeks to impair Electrolux's ownership interest in the Electrolux Consignment Inventory, the Debtors have no legal basis to grant an interest in property that is not property of their estates.

f.  Use, sale or impairment of the Electrolux Consignment Inventory without Electrolux's consent is an unlawful conversion of such property to which there is no adequate remedy at law.

g.  Electrolux will suffer serious and irreparable financial losses if the Electrolux Consignment Inventory is sold at discounted prices. Electrolux cannot specifically identify the financial losses until it obtains all records for the current status of the Consignment Inventory.

ANSWER:  The allegations in Paragraph 54 state legal conclusions to which no response is required.  To the extent a response is deemed required: Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 that Debtors are selling Electrolux Consignment Inventory at discount prices, and therefore denies same; the allegations in Paragraph 54 concerning the Bidding Procedures Motion, the Hilco Motion, and the DIP Motion are broad generalizations that do not accurately reflect the terms of the those motions, and are therefore denied; and the remaining allegations in Paragraph 54 are denied.

## FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT – OWNERSHIP)

55.  Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

56.      This is an action for declaratory relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. §§ 105 and 541, 546, Rule 57 of the Federal Rules of Civil Procedure, and Rules 7001 and 7001(9) of the Federal Rules of Bankruptcy Procedure.

ANSWER: Admitted that Plaintiff appears to seek the relief set forth in Paragraph 56, but denies that Plaintiff is entitled to any relief.

57.      There is a bona fide, actual, present, and practical need for a declaration regarding the ownership rights of the Electrolux Consignment Inventory, the rights of Gregg to sell the Electrolux Consignment Inventory, the rights of Electrolux to the proceeds of the sales of the Electrolux Consignment Inventory, and the right of Electrolux to regain possession of the Electrolux Consignment Inventory.

ANSWER: The allegations in Paragraph 57 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 57 are denied.

58.      An actual controversy exists for which necessary and proper relief may be granted by declaratory judgment.

ANSWER: The allegations in Paragraph 58 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 58 are denied.

59.      The declaration requested herein deals with a present, ascertained, or ascertainable state of facts, or a present controversy as to a state of facts.

ANSWER: The allegations in Paragraph 59 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 59 are denied.

60.    hhgregg, Gregg, HHG, Wells Fargo and the Consultant have, or reasonably may have, an actual, present, adverse, and antagonistic interest in this Court's determination that Electrolux owns the Electrolux Consignment Inventory and the proceeds of the sale of the Electrolux Consignment Inventory that the Electrolux Consignment Inventory may be sold by Gregg only pursuant to the terms of the Consignment Agreement and that Electrolux may repossess the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 60 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 60 are denied.

61.    There are no other parties known to have an interest in this determination other than the parties to this proceeding.

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61, and therefore denies same.

62.    The declaratory relief sought would not amount to the giving of legal advice by this Court, nor would it answer questions propounded from curiosity.

ANSWER:  The allegations in Paragraph 62 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 62 are denied.

63.    All conditions precedent to initiating and maintaining this proceeding have been performed, have occurred, or have been waived.

ANSWER:  The allegations in Paragraph 63 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 63 are denied.

64.    Therefore, Electrolux seeks a declaratory judgment prohibiting the sale of the Electrolux Consignment Inventory except in compliance with all of the terms of the Consignment Agreement, and, determining that Electrolux is the sole owner of the Electrolux Consignment Inventory and proceeds.

ANSWER:  Admitted that Plaintiff appears to seek the relief set forth in Paragraph 64, but denies that Plaintiff is entitled to any relief.

## SECOND CAUSE OF ACTION
## (DECLARATORY JUDGMENT – TRUE CONSIGNMENT)

65.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

66.    Electrolux seeks a declaratory judgment prohibiting the sale of the Electrolux Consignment Inventory except in compliance with all of the terms of the Consignment Agreement, and in particular:

a.   Determining that the Consignment Agreement is a true consignment agreement  and not a financing or security agreement.

b.   Determining that neither Gregg nor any other of the Debtors has or ever had  the authority to grant a security interest in or lien upon the Electrolux  Consignment Inventory.

c.   Determining that neither Wells Fargo nor any other entity has a security interest in or lien upon the Electrolux Consignment Inventory.

d.   Determining that Electrolux is entitled to the proceeds of all prepetition  and  postpetition sales of the Electrolux Consignment Inventory as provided by the  Consignment Agreement.

e.   Determining that the Consignment Agreement provides Electrolux with  the  right to demand the immediate return of the Electrolux Consignment  Inventory.

f.  Determining that neither Gregg nor the Consultant has the right to sell any of the Electrolux Consignment Inventory in a liquidation sale or in a sale under section 363 of the Code.

g.  Determining that Gregg and the Consultant may sell the Electrolux Consignment Inventory solely in the ordinary course of the Debtors' business.

h.  In the alternative to the preceding paragraph, terminating any implied license of Gregg to sell Electrolux Consignment Inventory bearing Electrolux's trademarks and to use other intellectual property rights belonging to Electrolux.

ANSWER:  Admitted that Plaintiff appears to seek the relief set forth in Paragraph 66, but denies that Plaintiff is entitled to any relief.

## THIRD CAUSE OF ACTION
## (BREACH OF CONTRACT – DEBTORS)

67.  Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

68.  By failing and refusing to make payments to Electrolux as required by the Consignment Agreement and for the other reasons stated above, Gregg has breached the Consignment Agreement.

ANSWER:  Paragraph 68 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68, and therefore denies same.

69.    Pursuant to Gregg's breach of the Consignment Agreement, Electrolux is entitled to payment for all Electrolux Consignment Inventory sold by Gregg, whether prepetition or postpetition.

ANSWER:  Paragraph 69 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69, and therefore denies same.

70.    Pursuant to Gregg's breach of the Consignment Agreement, Electrolux is entitled to  possession of Electrolux Consignment Inventory remaining in the possession of Gregg.

ANSWER:  Paragraph 70 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70, and therefore denies same.

## FOURTH CAUSE OF ACTION
## (BREACH OF CONTRACT – WELLS FARGO)

71.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

72.    Electrolux and Wells Fargo, as successor in interest and on behalf of itself and as Agent  for the lenders, are parties to the Intercreditor Agreement dated February 3, 2005 (the "Intercreditor Agreement").

ANSWER:   Admitted that Plaintiff and Wells Fargo, as successor in interest to Congress Financial Corporation (Central) and in its role as agent for lenders to Gregg, are parties to an Intercreditor Agreement, dated as of February 3, 2005 (the "Intercreditor Agreement").

73.    The Intercreditor Agreement provides that in the event of a Cash Dominion Event, as defined in the Intercreditor Agreement, and upon notice to Agent, Agent shall pay over to Electrolux the amount of proceeds deposited into or received into the lockbox or blocked account.

ANSWER:   Admitted that Section 1(b) defines certain procedures to be undertaken upon the occurrence of a Cash Dominion Event, as that term is defined in the Intercreditor Agreement; however the remaining allegations in Paragraph 73 concerning the Intercreditor Agreement are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

74.    On information and belief, a Cash Dominion Event occurred.

ANSWER:   The allegations in Paragraph 74 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 74 are denied.

75.    The Intercreditor Agreement requires that the Agent provide to Electrolux written notice of either a default or an event of default under its agreements with the Debtors.

ANSWER:  Admitted that the Intercreditor Agreement provides that Plaintiff and Wells Fargo are obligated to provide notices to each other of certain defaults by Gregg; however the remaining allegations in Paragraph 75 concerning the Intercreditor Agreement are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

76.    The Intercreditor Agreement provides that the ownership and security interest in and liens upon the Consignment Collateral, as defined in the Intercreditor Agreement, have and shall have priority over the security interests of Agent, if any.

ANSWER:  The allegations in Paragraph 76 state legal conclusions to which no response is required.   To the extent a response is deemed required, the allegations in Paragraph 76 concerning the Intercreditor Agreement are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

77.    The Intercreditor Agreement provides that the Agent will not contest the validity, perfection, priority or enforceability of the liens of Electrolux upon the Consignment Collateral. Electrolux agreed to not contest the validity, perfection, priority or enforceability of the liens upon the Revolving Loan Collateral of Agent.

ANSWER:  Admitted that the Intercreditor Agreement provides that Plaintiff and Wells Fargo are each obligated not to contest the other party's security interests in collateral in certain circumstances; however the remaining allegations in Paragraph 77 concerning the Intercreditor Agreement are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

78.    Electrolux has not contested the Agent liens upon the Revolving Loan Collateral, as defined in the Intercreditor Agreement.

ANSWER:  Denied.

79.    The Agent has not paid the amount of proceeds to Electrolux, has not provided Electrolux notice of default by the Debtors under the loan agreements, and has contested Electrolux's ownership and priority position in the Consignment Collateral.

ANSWER:   The allegations in Paragraph 79 state legal conclusions to the extent that they presume that Wells Fargo owes proceeds to Plaintiff and that Wells Fargo was obligated to provide certain notice(s) to Plaintiff, and therefore no response is required.  To the extent a response is deemed required to those allegations, they are denied.  The remaining allegations in Paragraph 79 are denied.

80.      As a result, the Agent has breached its obligations owed to Electrolux under the Intercreditor Agreement and the Agent is liable to Electrolux in an amount equal to the amount paid by Gregg to Agent that arose from the Debtors' sale of Electrolux Consignment Inventory, plus interest and attorney fees.

ANSWER:   The allegations in Paragraph 80 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 80 are denied.

## FIFTH CAUSE OF ACTION
## (RELIEF FROM STAY)

81.      Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:   Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

82.      As stated above, Gregg has mere possession of the Electrolux Consignment Inventory  and no ownership rights in the Electrolux Consignment Inventory.

ANSWER:   The allegations in Paragraph 82 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 82 are denied.

83.     Pursuant to Gregg's breach of the Consignment Agreement, Gregg is no longer entitled to possession of the Electrolux Consignment Inventory.

ANSWER:   Paragraph 83 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, and therefore denies same.

84.     Electrolux is entitled to relief from stay in order to repossess the Electrolux Consignment Inventory.

ANSWER:   The allegations in Paragraph 84 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 84 are denied.

**SIXTH CAUSE OF ACTION
(CONSTRUCTIVE TRUST)**

85.     Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:   Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

86.     Pursuant to the Consignment Agreement, Gregg holds the Electrolux Consignment Inventory and the proceeds from the sale of any of the Electrolux Consignment Inventory in trust for Electrolux.

ANSWER:   The allegations in Paragraph 86 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 86 are denied.

87.    Electrolux is entitled to an accounting from Gregg and return of all Electrolux Consignment Inventory and payment of all amounts due under the Consignment Agreement from the sale of Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 87 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 87 are denied.

88.    Under the DIP Order, all cash receipts by the Debtor are "swept" by Wells Fargo and used to satisfy obligations owed to it.

ANSWER:  Admitted that the Interim DIP Order provides that in certain circumstances cash receipts of the Debtors are deposited into accounts to satisfy obligations owed pursuant to the Prepetition Credit Agreement; however the allegations in Paragraph 88 concerning the Prepetition Credit Agreement and DIP Credit Agreement are otherwise broad generalizations that do not accurately reflect the terms of those agreements, and are therefore denied.

89.    Electrolux is entitled to an accounting from Wells Fargo regarding all cash receipts received arising from the sale of Electrolux's consignment inventory, and is entitled to payment  from Wells Fargo of all such proceeds.

ANSWER:  The allegations in Paragraph 89 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 89 are denied.

90.    Wells Fargo holds all such proceeds in constructive trust for the benefit of Electrolux  and the proceeds therefrom.

ANSWER:  The allegations in Paragraph 90 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 90 are denied.

## SEVENTH CAUSE OF ACTION
### (CONVERSION)

91.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

92.    Gregg continues to sell the Electrolux Consignment Inventory, and Gregg has wrongfully failed and refused to pay Electrolux proceeds received from the sale of Electrolux Consignment Inventory.  The proceeds are instead swept into an account controlled by Wells Fargo on behalf of the lenders.

ANSWER:  Admitted that cash proceeds from sales of Debtors' inventory are deposited into accounts for the benefit of Debtors' lenders in certain circumstances pursuant to the terms of the Prepetition Credit Agreement and the DIP Credit Agreement; otherwise Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92, and therefore denies same.

93.    Gregg and Wells Fargo, on behalf of the lenders, wrongfully retain possession of the unsold Electrolux Consignment Inventory.

ANSWER:  Denied.

94.    Gregg and Wells Fargo, on behalf of the lenders, have converted the Electrolux Consignment Inventory and the proceeds from the sale of Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 94 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 94 are denied.

95.    Electrolux has suffered damages from such conversion of the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 95 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 95 are denied.

96.    Because of such conversion of the Electrolux Consignment Inventory, Electrolux is entitled to payment from Gregg and Wells Fargo, on behalf of lenders, as calculated under the Consignment Agreement for all Electrolux Consignment Inventory sold by Gregg and to have Gregg surrender to Electrolux of all Electrolux Consignment Inventory in the possession of Gregg.

ANSWER:  The allegations in Paragraph 96 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 96 are denied.

## EIGHTH CAUSE OF ACTION
## (UNJUST ENRICHMENT – WELLS FARGO)

97.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

98. Wells Fargo had specific and express knowledge of Electrolux's Consignment Agreement and Electrolux's ownership interest in the Electrolux Consignment Inventory.

ANSWER: Admitted on information and belief that Wells Fargo had knowledge of the Consignment Agreement, but denied as to the remaining allegations in Paragraph 98.

99. At all times, Wells Fargo specifically excluded the Electrolux Consignment Inventory from its collateral and its borrowing base, and expressly deemed the Electrolux Consignment Inventory as ineligible collateral.

ANSWER: Denied.

100. Wells Fargo did not extend any credit to Gregg based on and otherwise did not rely on the Electrolux Consignment Inventory in connection with any of its business transactions with Gregg.

ANSWER: Denied.

101. Based on the Consignment Agreement, Electrolux shipped substantial volumes and variety of products to Gregg in support of Gregg's business operations to allow Gregg to always have the necessary quantities and product for Gregg to maximize its business operations.

ANSWER: Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101, and therefore denies same.

102. Failure of support from Electrolux would have caused material financial damage to Gregg's business operations. In fact, Wells Fargo identified the Consignment Agreement as a "Material Contract" in the Prepetition Credit Agreement, and a default under the Consignment Agreement was a default of the Prepetition Credit Agreement.

ANSWER:  Denied that Wells Fargo identified the Consignment Agreement as a "Material Contract" in the Prepetition Credit Agreement and that a default under the Consignment Agreement was a default of the Prepetition Credit Agreement; the remaining allegations in Paragraph 102 state legal conclusions to which no response is required.  To the extent a response is deemed required, the remaining allegations in Paragraph 102 are denied.

103.    Wells Fargo's assertion of any interest in the Electrolux Consignment Inventory will  materially prejudice and economically damage Electrolux.

ANSWER:  The allegations in Paragraph 103 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 103 are denied.

104.    On information and belief, Wells Fargo has asserted or may assert a position contrary to the terms of the Consignment Agreement and compliance therewith, materially prejudicial to  Electrolux's ownership of the Electrolux Consignment Inventory and its proceeds.

ANSWER:  The allegations in Paragraph 104 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 104 are denied.

105.    Wells Fargo's assertion of an interest in the Electrolux Consignment Inventory would  unjustly enrich Wells Fargo at Electrolux's expense and prejudice.

ANSWER:  The allegations in Paragraph 105 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 105 are denied.

106.    Wells Fargo should be precluded and prohibited from asserting any  interest in or benefitting from the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 106 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 106 are denied.

## NINTH CAUSE OF ACTION
## (UNJUST ENRICHMENT – DEBTORS' ESTATE)

107.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

108.    Shipment of goods by Electrolux to Gregg pursuant to the Consignment Agreement  materially enhanced Gregg's inventory product offerings for customers, allowing Gregg to  generate substantial revenue to maintain a chain of 220 stores throughout the United States.

ANSWER:   Paragraph 108 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore denies same.

109.    As a result, Gregg was able to purchase goods from vendors on open account, and such  vendors made substantial profit for many years.

ANSWER:   Paragraph 109 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore denies same.

110.    Creditors had knowledge that Gregg sold to its customers Electrolux's branded products.

ANSWER:  The allegations in Paragraph 110 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 110 are denied.

111.    On information and belief, creditors knew that the Electrolux Consignment Inventory  was delivered on consignment  and that Electrolux owned the Electrolux Consignment Inventory  at all times.

ANSWER:  The allegations in Paragraph 111 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 111 are denied.

112.    Any assertion by the Debtors of any interest in the Electrolux Consignment Inventory would materially prejudice the rights of Electrolux.

ANSWER:  The allegations in Paragraph 112 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 112 are denied.

113.    Debtors have asserted or may assert a position contrary to the terms of the Consignment Agreement and compliance therewith.

ANSWER:  The allegations in Paragraph 113 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 113 are denied.

114.    The Debtors should be precluded and prohibited from asserting any interest in  or  benefitting from the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 114 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 114 are denied.

### TENTH CAUSE OF ACTION
### (ESTOPPEL ALL PARTIES)

115.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

116.    The Consignment Agreement between Electrolux and Gregg included, among other  provisions, an agreement that Electrolux owned the Electrolux Consignment Inventory and  contained a promise by Gregg to comply with the Consignment Agreement, including timely  payment to Electrolux upon the sale of the Electrolux Consignment Inventory.

ANSWER:  The allegations in Paragraph 116 concerning the Consignment Agreement are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

117.    Electrolux has performed all of its obligations under the Consignment Agreement at all  times, and Gregg and its business and various stakeholders have materially benefitted from  Electrolux's compliance with its obligations under the Consignment Agreement.

ANSWER:   Paragraph 117 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117, and therefore denies same.

118.    Electrolux's performance was in reliance on Gregg's performance of its obligations under the Consignment Agreement, including payment to Electrolux upon the sale of the Electrolux Consignment Inventory.

ANSWER:   Paragraph 118 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118, and therefore denies same.

119.    Gregg's failure to perform its obligations under the Consignment Agreement is detrimental to Electrolux.

ANSWER:   Paragraph 119 makes no allegations regarding Wells Fargo and therefore no responsive pleading is required.  To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119, and therefore denies same.

120.    It is unconscionable for Gregg to not perform its obligations under the Consignment Agreement, and for any party to assert any interest in the Electrolux Consignment Inventory or proceeds thereof.   Gregg and the other defendants should each be estopped from asserting any rights or taking action adverse or prejudicial to Electrolux's rights under the Consignment Agreement and with respect to the Electrolux Consignment Inventory and proceeds.

ANSWER:  The allegations in Paragraph 120 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 120 are denied.

121.   Based on the express exclusions of the Electrolux Consignment Inventory and proceeds in the Credit Agreements, Wells Fargo, on behalf of the lenders, should be estopped from asserting any rights or taking action adverse or prejudicial to Electrolux's rights under the Consignment Agreement and with respect to the Electrolux Consignment Inventory and proceeds.

ANSWER:   The allegations in Paragraph 121 state legal conclusions to which no response is required.   To the extent a response is deemed required, the allegations in Paragraph 121 are denied.

## ELEVENTH CAUSE OF ACTION
## (MARSHALLING)

122.   Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:   Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

123.   Wells Fargo asserts a first priority lien on the Debtors' assets (not including Electrolux's consignment inventory and proceeds).

ANSWER:   Admitted that Wells Fargo asserts a first priority lien as to certain of Debtors' assets; otherwise the allegations in Paragraph 123 are broad generalizations that do not accurately reflect the terms of the Prepetition Credit Agreement and the DIP Credit Agreement, and are therefore denied.

124.   Wells Fargo as set forth above, assiduously excluded Electrolux's consignment inventory and proceeds from its collateral and borrowing base.

ANSWER:   Denied.

125.    Upon the filing of the Chapter 11 case, Wells Fargo has attempted, in the DIP Motion, to effectively seize the Electrolux Consignment Inventory and all proceeds thereof as part of its collateral.

ANSWER: Denied.

126.    Wells Fargo's loans to the Debtors were in no way based on the Electrolux consignment inventory and proceeds, which was expressly excluded.

ANSWER: Denied.

127.    Electrolux has no lien on the Debtors' assets.

ANSWER: The allegations in Paragraph 127 state legal conclusions to which no response is required. To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127.

128.    Wells Fargo asserts its rights to be paid arising from its lien on the Debtors' assets.

ANSWER: Admitted.

129.    Wells Fargo may not take action to defeat Electrolux's ownership interest under the doctrine of marshalling.

ANSWER: The allegations in Paragraph 129 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 129 are denied.

## TWELFTH CAUSE OF ACTION
## (THIRD PARTY BENEFICIARY)

130.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER: Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

- 41 -

131.    The Prepetition Credit Agreement and the DIP Credit Agreement (the "Credit Agreements") specifically and expressly exclude the Electrolux consignment inventory from the liens and security interests of the lenders, and from the Debtors' borrowing base.

ANSWER:  Denied.

132.    The Prepetition Credit Agreement and the DIP Credit Agreement (the "Credit Agreements") provide that the Electrolux Consignment Agreement is a "Material Contract", the default of which constitutes a default under the Credit Agreements.

ANSWER:  Denied.

133.    Wells Fargo deemed Electrolux's Consignment Agreement essential to the Debtors' business operation, and sought to protect itself if the Debtors breached the Consignment Agreement.

ANSWER:  Denied.

134.    Wells Fargo's loan covenant regarding "Material Contracts" was intended to insure performance of the Consignment Agreement by the Debtors.

ANSWER:  The allegations in Paragraph 134 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 134 are denied.

135.    Electrolux was a beneficiary of such loan covenants.

ANSWER:  The allegations in Paragraph 135 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 135 are denied.

136.    The DIP Credit Agreement additionally includes an approved budget providing for the payment of consignment vendors and Electrolux is the intended benefit of such provision.

ANSWER:  Admitted that the DIP Credit Agreement provides for an approved budget, but denied as to the remaining allegations in Paragraph 136.

137.    As the intended third party beneficiary to the DIP Credit Agreement, Electrolux is entitled to enforce the terms of the DIP including but not limited to payment to Electrolux in compliance with the budget and the exclusion of the Electrolux consignment inventory and  proceeds from the lenders' liens and security interests under the Credit Agreements.

ANSWER:  The allegations in Paragraph 137 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 137 are denied.

## THIRTEENTH CAUSE OF ACTION
## (WAIVER)

138.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein, including but not limited to the provisions in the Credit Agreements regarding Electrolux's consignment inventory and proceeds, and the Electrolux Consignment Agreement.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

139.    Wells Fargo has waived any rights to any interest in Electrolux' consignment inventory  and proceeds thereof.

ANSWER:  The allegations in Paragraph 139 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 139 are denied.

- 43 -

## FOURTEENTH CAUSE OF ACTION
## (RECLAMATION)

140.    Electrolux repeats and incorporates by reference the allegations contained in the preceding paragraphs as though set forth in full herein.

ANSWER:  Wells Fargo repeats and incorporates by reference the responses contained in the preceding paragraphs as though set forth in full herein.

141.    In the alternative and reserving all its rights regarding all causes of action herein,  Electrolux hereby pleads its reclamation rights.

ANSWER:  Admitted that Plaintiff appears to seek the relief set forth in Paragraph 141, but denies that Plaintiff is entitled to any relief.

142.    Within 45 days immediately before the Petition Date, Debtors received certain goods  that Electrolux delivered to Debtors (the "Reclaimed Goods").

ANSWER:  Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142, and therefore denies same.

143.    On March 24, 2017, Electrolux sent a  written demand for reclamation to Debtors demanding the return of the Reclaimed Goods (the "Demand").  A copy of the Demand is attached as Exhibit B.  The Reclaimed Goods have an aggregate value of not less than $9,344,781.39.

ANSWER:  Admitted that Exhibit B is a March 24, 2017 letter from Plaintiff purporting to assert reclamation demands, but denied as to the remaining allegations in Paragraph 143.

144.    Debtors are parties to an Amended and Restated Loan and Security Agreement dated  March 29, 2011, as amended (the "Prepetition Credit Agreement"), as more fully set forth in  Debtors' *Motion for Interim and Final Orders (I) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364; (II) Granting*

*Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* (the "DIP Motion") [Dkt. No. 18].  (*See e.g.*, Dkt. No. 18 ¶¶ 6-8.)

ANSWER:  Admitted that Gregg and HHG are parties to the Prepetition Credit Agreement, which is described in part in Debtors' DIP Motion; the remaining allegations in Paragraph 144 are otherwise denied.

145.    Wells is the Administrative Agent, Collateral Agent, and FILO Agent under the Prepetition Credit Agreement.

ANSWER:  Admitted that Wells Fargo is party to the Prepetition Credit Agreement as the Administrative Agent and the Collateral Agent; the remaining allegations in Paragraph 145 are denied.

146.    Under the Prepetition Credit Agreement, Debtors granted Wells a security interest in and lien upon all "Collateral" as defined in the Prepetition Credit Agreement, which includes  Debtors' inventory and the Reclaimed Goods (*Id.* ¶ 8.)

ANSWER:  Admitted that the Prepetition Credit Agreement granted Wells Fargo a security interest in the Collateral, as that term is defined in the Prepetition Credit Agreement; the remaining allegations in Paragraph 146 are broad generalizations that do not accurately reflect the terms of that agreement, and are therefore denied.

147.    Upon information and belief, Wells was fully informed and aware of Debtors' financial  condition in the months leading up to the Petition Date.

ANSWER: The allegations in Paragraph 147 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 147 are denied.

148. Upon information and belief, Debtors were insolvent at least as of 45 days prior to the Petition Date.

ANSWER: The allegations in Paragraph 148 state legal conclusions to which no response is required. To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148, and therefore denies same.

149. Upon information and belief, Wells was aware that Debtors were insolvent 45 days prior to the Petition Date and at the time that Debtors received the Reclaimed Goods.

ANSWER: The allegations in Paragraph 149 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 149 are denied.

150. Upon information and belief, Wells was aware that Debtors could not and would not pay Electrolux for all the Reclaimed Goods at the time Debtors received them.

ANSWER: The allegations in Paragraph 150 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 150 are denied.

151. Upon information and belief, Wells obtained the benefit of the Reclaimed Goods, knowing that Debtors would not pay Electrolux to either secure extensions of credit under the Prepetition Credit Agreement or utilize the proceeds of the Electrolux Consigned

Inventory, including the Reclaimed Goods, to allow the Debtors to continue to operate in the ordinary course.

ANSWER:  The allegations in Paragraph 151 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 151 are denied.

152.    Upon information and belief, Wells financed Debtors' continued operations in order to perpetuate Debtors as the best vehicle to orderly liquidate Wells' collateral and maximize Wells' recovery.

ANSWER:  The allegations in Paragraph 152 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 152 are denied.

153.    As set forth in the DIP Motion and the order granting the DIP Motion on an interim basis ("Interim DIP Order") [Dkt. No. 50], a DIP financing agreement was approved on an interim basis (the "DIP Financing Agreement") [Dkt. No. 18 at Ex B (DIP Financing Agreement)].

ANSWER: Admitted.

154.    Electrolux filed an Objection to the DIP Motion, objecting to approval of the DIP Motion on a final basis, and a Supplemental Objection for the reasons stated in such Objection  [Dkt. No. 269 and 549.]

ANSWER: Admitted.

155.    To date, Debtors continue to sell the Reclaimed Goods despite Electrolux's timely Demand.  The amount of Reclaimed Goods that remain in Debtors' possession as of the petition date is $9,344,781.39 and continues to be irreparably harmed, as a result of the

sale of the Reclaimed Goods without paying the Obligations owed to Electrolux as set forth above.

ANSWER: The allegations in Paragraph 155 state legal conclusions to which no response is required. To the extent a response is deemed required, Wells Fargo is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155, and therefore denies same.

156. Electrolux's right to recover actual possession of the Reclaimed Goods is a possessory right that is not compensable through a money judgment and as a result, Electrolux will suffer irreparable harm if the Reclaimed Goods are not returned to Electrolux.

ANSWER: The allegations in Paragraph 156 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 156 are denied.

157. Upon information and belief, Wells is not, within the meaning of § 2-702 of the Uniform Commercial Code, a good faith purchaser or buyer in the ordinary course and, as such, does not have a priming lien with respect to Electrolux's reclamation claim in the Reclaimed Goods or proceeds from the Reclaimed Goods under Bankruptcy Code § 546(c).

ANSWER: The allegations in Paragraph 157 state legal conclusions to which no response is required. To the extent a response is deemed required, the allegations in Paragraph 157 are denied.

158. As a result, Electrolux's right to the Reclaimed Goods and proceeds of the Reclaimed Goods is not subject to Lenders' lien in the Reclaimed Goods.

ANSWER:  The allegations in Paragraph 158 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 158 are denied.

159.    In addition, the Financing Motion and Interim Order provide that all cash, collections,  and proceeds of the Pre-Petition Collateral and DIP Collateral are to be paid to the Pre-Petition  Agent  for  application  in  reduction  of  the  Pre-Petition  Credit  Agreement  Loans and  that  upon  entry  of  the  Final  Order,  the  Debtors  will  apply  proceeds  of  the  DIP  Credit Agreement to pay all  remaining Pre-Petition Secured Debt in full (the "Roll-Up").

ANSWER:   Admitted that the Interim DIP Order and the DIP Motion provide that proceeds from sales of Debtors' inventory will be collected to repay Debtors' prepetition debt in certain circumstances; otherwise the allegations in Paragraph 159 are broad generalizations that do not accurately reflect the terms of the Interim DIP Order and the DIP Motion, and are therefore denied.

160.    Even  if  Wells  qualifies  as  a  good  faith  purchaser,  to  the  extent  loans  under the  Pre-Petition  Credit  Agreement  have  been  "rolled-up,"  Electrolux's  reclamation  claim  is  first in  priority and right. *In re Reichhold Holdings US, Inc.*, 556 B.R. 107 (Bankr. D. Del. 2016).

ANSWER:  The allegations in Paragraph 160 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 160 are denied.

161.    Electrolux  is  entitled  to  immediate  possession  of  the  Reclaimed  Goods  from Debtor  under Bankruptcy Code § 546(c).

ANSWER:  The allegations in Paragraph 161 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 161 are denied.

162.    Electrolux has a reclamation right to the Reclaimed Goods based on Electrolux's Demand, as well as a first priority lien in the Reclaimed Goods and proceeds from Debtors' sale of the Reclaimed Goods.

ANSWER:  The allegations in Paragraph 162 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 162 are denied.

163.    The lenders' purported first priority lien under the Pre-Petition Credit Agreement and DIP Financing Agreement is subordinate to Electrolux because lenders are not buyers in the ordinary course, good faith purchasers, or otherwise entitled to a first priority lien under 2-702 of the Uniform Commercial Code or Bankruptcy § 546(c).

ANSWER:  The allegations in Paragraph 163 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 163 are denied.

164.    Debtors' have not honored Electrolux's Demand, continues to sell the Reclaimed Goods, and has not paid the proceeds to Electrolux.

ANSWER:  The allegations in Paragraph 164 state legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations in Paragraph 164 are denied.

To the extent that Plaintiff's Prayer for Relief and "Wherefore" clauses following Paragraph 164 of the Amended Complaint must be answered, Wells Fargo denies that Plaintiff is entitled to the relief requested or to any relief whatsoever.

## SPECIFIC DEFENSES

Each and every allegation in Plaintiff's Amended Complaint that is not admitted is expressly denied.  In addition, and without assuming any burden of proof that would not otherwise be placed on Wells Fargo by law, Wells Fargo asserts the following specific defenses.

1.      Plaintiff's Amended Complaint fails to state a claim upon which relief may be granted.

2.      Plaintiff's claims must be denied because Article 9 of the Uniform Commercial Code exclusively governs the relationship between Debtors, Plaintiff, and other creditors.

3.      Plaintiff's claims must be denied to the extent its damages are the result of its own conduct or another party's actions, omissions and/or course of conduct.

4.      Plaintiff's claims are barred because all damages claimed are the result of intervening or superseding causes.

5.      Plaintiff's claims are barred by the doctrines of waiver and estoppel.

6.      Plaintiff's claims as to Wells Fargo are barred by operation of Wells Fargo's superior security interests in the Debtors' inventory.

7.      Plaintiff's claims are barred because Wells Fargo complied with the terms of the Prepetition Credit Agreement, the DIP Credit Agreement, and the Intercreditor Agreement.

8.      Plaintiff's claims as to Wells Fargo are barred because Plaintiff failed to satisfy conditions precedent in the Intercreditor Agreement and otherwise failed to perform pursuant to the Intercreditor Agreement.

9.      Plaintiff's claims as to Wells Fargo are barred by operation of the Intercreditor Agreement.

10.     Plaintiff's claims are barred because Plaintiff would be unjustly enriched if it would be allowed to recover any part of the damages alleged in the Amended Complaint.

11.     The Amended Complaint or any relief sought by Plaintiff is barred, in whole or in part, by such additional defenses as Wells Fargo may have that cannot now be articulated due to the generality of Plaintiff's pleading.  Wells Fargo reserves the right to supplement the foregoing and to raise additional defenses as the case progresses.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Wells Fargo respectfully requests that Plaintiff's Amended Complaint be dismissed with prejudice, that the Court enter judgment in Wells Fargo's favor and against Plaintiff, and the Wells Fargo be awarded its costs, attorney's fees, and such other relief as the Court deems just and proper.

## WELLS FARGO'S COUNTERCLAIM

Wells Fargo files this Counterclaim against Electrolux.  In support thereof, Wells Fargo states as follows:

## PARTIES

1.    Counterclaim Plaintiff Wells Fargo is a nationally chartered bank with its principal place of business in Sioux Falls, South Dakota.

2.    Wells Fargo is the successor in interest to Congress Financial Corporation (Central).  Congress Financial Corporation (Central) was renamed Wachovia Capital Finance Corporation (Central) on March 30, 2005.  Wachovia Capital Finance Corporation (Central) in turn was acquired by Wells Fargo Capital Finance, LLC on July 1, 2010.  Wells Fargo Capital Finance, LLC is a subsidiary of Wells Fargo.

3.    On information and belief, Counterclaim Defendant Electrolux is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

## JURISDICTION

4.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 as a proceeding related to the Debtors' Chapter 11 proceedings, captioned *In re hhgregg, Inc., et al.*, No. 17-01302-RLM.

5.    Venue is proper pursuant to 28 U.S.C. § 1409(a).

6.    This Counterclaim is brought pursuant to Rules 7001, 7003, and 7013 of the Federal Rules of Bankruptcy Procedure.

7.    The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

# FACTUAL ALLEGATIONS

**Intercreditor Agreement**

8.      On February 3, 2005, Electrolux Home Products, Inc. ("Electrolux") entered into an Intercreditor Agreement[2] with Wells Fargo, as successor in interest to Congress Financial Corporation (Central), acting as agent for lenders to Gregg.[3]

9.      Broadly speaking, the Intercreditor Agreement dictates the respective rights and obligations of Electrolux and Wells Fargo concerning debts owed to them by Gregg. Specifically, the Intercreditor Agreement "confirm[s] the relative priority of the ownership and security interests" of each of Electrolux and Wells Fargo in the collateral delivered by Electrolux to Gregg. Intercreditor Agreement at 1.

10.     The Intercreditor Agreement references collateral delivered by Electrolux to Gregg pursuant to a consignment agreement dated September 24, 2003, as it may be "amended, modified, supplemented, extended, renewed, restated, or replaced." Intercreditor Agreement at 1. On information and belief, the Consignment Agreement attached as Exhibit A to Electrolux's Amended Complaint is an extension, renewal, restatement, or replacement of the September 24, 2003 consignment agreement.

11.     Similarly, the Intercreditor Agreement references a revolving Loan and Security Agreement entered into between Gregg and Wells Fargo, as agent for certain lenders to Gregg, dated as of February 3, 2005, as it may from time to time be amended or restated. Intercreditor Agreement at 1. The Prepetition Credit Agreement is an amendment and restatement of the original Loan and Security Agreement. Prepetition Credit Agreement at 1.

---

[2]     A copy of the Intercreditor Agreement is attached as Exhibit A.

[3]     For ease of reference, when discussing Congress Financial Corporation (Central) in connection with the Intercreditor Agreement, the allegations shall refer to "Wells Fargo."

12.     The Intercreditor Agreement contains a choice of law provision stating that the laws of the State of New York exclusively govern the Intercreditor Agreement.  Intercreditor Agreement ¶ 14.

13.     The Intercreditor Agreement further provides that it will remain in effect until the full satisfaction of all obligations and liabilities owed by Gregg to Wells Fargo pursuant to the Prepetition Credit Agreement, (Intercreditor Agreement ¶ 15), and that it will remain in effect before and after the filing of any bankruptcy petition by Gregg, (*id.* ¶ 8).

14.     Pursuant to Paragraph 2 of the Intercreditor Agreement, Wells Fargo agreed that "it will not contest the validity, perfection, priority or enforceability of the liens of [Electrolux] upon the Consignment Collateral," as that term is defined in the Intercreditor Agreement.

15.     Likewise, Electrolux agreed that "it will not contest the validity, perfection, priority or enforceability of the liens upon the Revolving Loan Collateral" of Wells Fargo. Intercreditor Agreement ¶ 2.  The "Revolving Loan Collateral" is defined as "all of the assets and properties of [Gregg] including all of its accounts, inventory, documents, instruments, chattel paper, general intangibles, contract rights, equipment and the products and proceeds thereof," that secured the original loan and security agreement, subsequently amended and restated as the Prepetition Credit Agreement.  Intercreditor Agreement at 1.

16.     Electrolux agreed to "waive[] and relinquish[]" and "not to assert any lien, security interest, or other interest in accounts or general intangibles . . . , including without limitation, accounts and general intangibles that constitute proceeds" of inventory delivered pursuant to the Consignment Agreement "except as set forth in Section 1(b)" of the Intercreditor Agreement.  Intercreditor Agreement ¶ 3. Electrolux further agreed that Gregg's "accounts and

general intangibles shall not in any event constitute part" of the consignment collateral subject to the Intercreditor Agreement. *Id.*

17.     Electrolux further expressly agreed to waive "any and all rights to have any Collateral (including without limitation [collateral delivered subject to the Consignment Agreement]) or any part thereof granted to [Wells Fargo] marshalled upon any foreclosure or other disposition of such Collateral by Agent or Borrower." Intercreditor Agreement ¶ 4.

**Consignment Collateral in the Intercreditor Agreement**

18.     The Intercreditor Agreement generally provides that Electrolux has a security interest and lien in inventory delivered to Gregg pursuant to the Consignment Agreement, strictly with respect to Wells Fargo. Intercreditor Agreement ¶ 1(a).

19.     The Intercreditor Agreement distinguishes between inventory delivered to Gregg, and the proceeds from the sale of such inventory. In particular, the Intercreditor Agreement defines Consignment Collateral as the inventory itself and proceeds of that inventory "but only to the extent that such proceeds consist of either (i) identifiable cash proceeds of [the inventory] received by [Gregg] on or prior to the delivery of the [inventory] to the purchaser thereof" or (ii) insurance proceeds for losses or damage to inventory. Intercreditor Agreement ¶ 1(a).

20.     The Intercreditor Agreement further provides that "Consignment Collateral shall not include: (i) any amounts at any time deposited in or received in the lockbox or blocked account established by [Gregg] in connection with the [Prepetition Credit Agreement] (whether or not such amounts represent proceeds of [Electrolux inventory] received by [Gregg] on or before delivery of the [Electrolux inventory] to the purchaser thereof . . . (ii) all accounts, contract rights, and general intangibles arising from credit card purchases by customers of [Gregg], and (iii) any other amounts at any time paid to [Wells Fargo] in respect to the

obligations of [Gregg] to [Wells Fargo] under the Prepetition Credit Agreement . . . ." Intercreditor Agreement ¶ 1(a).

21.     The Intercreditor Agreement further clarifies that Electrolux "does not have and will not obtain a security interest in or lien upon any of the assets of [Gregg] (including, without limitation, the Revolving Loan Collateral) other than the Consignment Collateral." Intercreditor Agreement ¶ 1(a).

22.     In other words, Electrolux's security interest is strictly limited to (1) actual inventory delivered pursuant to the Consignment Agreement and (2) identifiable cash proceeds from such inventory that are received at the time of purchase and that have not been deposited in a lockbox or blocked account pursuant to the Prepetition Credit Agreement. Otherwise, Electrolux agreed that it has no security interest or lien upon any other assets of Gregg.

23.     The Intercreditor Agreement provides that Electrolux can make a claim as to cash proceeds that have been deposited in a lockbox or blocked account pursuant to the Prepetition Credit Agreement, but such claim must be effectuated by a notice in writing that must be made within one week that any amounts were due by Gregg to Electrolux. Intercreditor Agreement ¶ 1(b).

**Gregg Enters into Bankruptcy, and Electrolux Breaches the Intercreditor Agreement**

24.     On March 6, 2017, Gregg and its affiliates, hhgregg and HHG, filed voluntary petitions pursuant to Chapter 11 of the Bankruptcy Code.

25.     The following day, the Debtors filed the DIP Motion, seeking post-petition financing in exchange for the grant of liens and superpriority claims to the post-petition lenders, with Wells Fargo acting as Administrative Agent and Collateral Agent.

26.     Wells Fargo has, in every respect, performed its obligations pursuant to the Intercreditor Agreement.  In particular, Wells Fargo has not challenged or contested the validity, perfection, priority or enforceability of Electrolux's liens upon the Electrolux inventory, to the extent such liens exist.

27.     On the contrary, Electrolux has engaged in a campaign of attempting to challenge and discredit Wells Fargo's liens upon the Revolving Loan Collateral, *i.e.*, the Debtors' assets that secure the Prepetition Credit Agreement and the DIP Credit Agreement, in flagrant breach of the Intercreditor Agreement.

28.     On March 20, 2017, Electrolux brought this action, seeking initially a temporary restraining order.  The Complaint (and in most respects, the accompanying motion for temporary restraining order) argued—incorrectly—that Wells Fargo has no security interest in any proceeds of the inventory delivered by Electrolux to the Debtors, notwithstanding the clear and unequivocal language in the Intercreditor Agreement.  *See, e.g.*, Verified Complaint ¶¶ 30, 37, 63(e), 76-77, 86, 91-93, 111-12, 124 [Doc. No. 1].

29.     On March 21, 2017, Electrolux filed its *Objection to Debtors' Motion for the Bidding Procedures and Motions for Entry of Final Orders on the (1) Motion to Assume the Hilco Consulting Agreement; and (2) DIP Motion* [Proceeding No. 17-01302, Doc. No. 269], where it argued, among other things, that it "reserves the right to bring any and all claims, and seek sanctions, against Wells Fargo" with respect to its collection of proceeds from Electrolux inventory pursuant to the Prepetition Credit Agreement and Interim DIP Order.

30.     On March 28, 2017, in the course of arguing that the Debtors should be enjoined from selling Electrolux inventory, Electrolux's counsel questioned whether "the banks have a security interest in Electrolux's consigned inventory," and argued—again, incorrectly—that the

collateral securing the Prepetition Credit Agreement and DIP Credit Agreement excludes proceeds from sales of Electrolux inventory. Mar. 28, 2017 Hr'g Tr. at 27-29 [Proceeding No. 17-01302, Doc. No. 557].

31. On April 4, 2017, Electrolux filed its *Supplemental Objection to Debtors' Motion for Bidding Procedures and Motions for Entry of Final Orders on the (1) Motion to Assume the Hilco Consulting Agreement; and (2) DIP Motion* [Proceeding No. 17-01302, Doc. No. 549]. Electrolux again reiterated its challenge to Wells Fargo's security interests in the Debtors' assets, this time styling the argument as a reclamation claim: "Electrolux's reclamation claim is superior to [Wells Fargo's] lien on Debtors' inventory because the lender's security interests specifically excluded goods delivered by Electrolux." *Id.* ¶ 4; *see also id.* ¶ 8.

32. On April 5, 2017, Electrolux filed its *Objection to Debtors' Motion for Order (I) Authorizing Debtors to Enter into the Consulting Agreement, (II) Authorizing and Approving the Conduct of Phase II Store Closing Sales Free and Clear of All Liens, Claims, and Encumbrances; and (III) Related Relief* [Proceeding No. 17-01302, Doc. No. 574]. Electrolux again threatened "to bring any and all claims, and seek sanctions, against Wells Fargo and the Secured Lender Agents" in connection with Wells Fargo's receipt of proceeds pursuant to the Prepetition Credit Agreement and the DIP Credit Agreement.

33. On April 13, 2017, Electrolux filed its Amended Complaint, repeating its assertions that Wells Fargo has no security interest in any proceeds of the inventory delivered by Electrolux to the Debtors, notwithstanding the clear and unequivocal language in the Intercreditor Agreement.

34. Wells Fargo has suffered significant damages, including, but not limited to, attorney's costs and fees to respond to and rebut Electrolux's litany of baseless claims that seek

to undermine Wells Fargo's security interests in the Debtors' assets, and these damages are a direct result of Electrolux's repeated and willful breaches of the Intercreditor Agreement.

35.    Wells Fargo has incurred, and will continue to incur significant damages, including, but not limited to, attorney's fees and costs due to Electrolux's continued prosecution of its baseless claims against Wells Fargo and corresponding breaches of the Intercreditor Agreement.

## COUNT I
## BREACH OF CONTRACT

36.    The foregoing paragraphs are hereby incorporated as if fully set forth herein.

37.    The Intercreditor Agreement is a valid and enforceable contract between Electrolux and Wells Fargo.

38.    Wells Fargo has performed its obligations pursuant to the Intercreditor Agreement.

39.    As discussed above, Electrolux has repeatedly, and willfully, challenged and contested Wells Fargo's security interests in the Debtors' assets, in breach of the Intercreditor Agreement.

40.    As a result, Wells Fargo has suffered significant damages, including, but not limited to, attorney's costs and fees.  Wells Fargo expects that it will continue to suffer significant damages in this respect as long as Electrolux challenges Wells Fargo's security interests.

## COUNT II
## DECLARATORY JUDGMENT

41.    The foregoing paragraphs are hereby incorporated as if fully set forth herein.

42.     Substantial and actual controversies exist between Electrolux and Wells Fargo as to whether any part of the inventory delivered by Electrolux to the Debtors and any proceeds from sales thereof should be considered "Consignment Collateral" within the meaning of the Intercreditor Agreement.

43.     The express terms of the Intercreditor Agreement provide that proceeds from the sale of inventory delivered by Electrolux in the form of credit card receivables are not considered Consignment Collateral.  Moreover, other proceeds from the sales of inventory delivered by Electrolux are likewise excluded from the scope of Consignment Collateral unless they are cash proceeds from sales that (a) are not deposited into a lockbox or blocked account, or (b) are deposited into a lockbox or blocked account that have been identified specifically by Electrolux within one week that such payments should have been made by the Debtors to Electrolux.

44.     To the extent that any Electrolux inventory or proceeds thereof are not considered part of the Consignment Collateral, then by operation of the Prepetition Credit Agreement, the DIP Credit Agreement, and the Intercreditor Agreement, Wells Fargo has a lien on such assets that is superior to Electrolux, among other creditors.

45.     Wells Fargo therefore seeks an order from this Court declaring:

a.   Electrolux cannot make claims as to any proceeds from sales of Electrolux inventory, except to the extent that such proceeds are identifiable cash proceeds that have not been deposited into a lockbox or blocked account; and

b.   Electrolux does not have a superior security interest to Wells Fargo with respect to any proceeds from sales of Electrolux inventory.

## PRAYER FOR RELIEF

WHEREFORE, Wells Fargo respectfully requests that this Court enter judgment against Electrolux in favor of Wells Fargo for the following relief:

1.      Awarding judgment against Electrolux and in favor of Wells Fargo for all damages, including, but not limited to, attorney's fees and costs that Wells Fargo has expended and will expend to defend against Electrolux's arguments, objections, and claims, caused by Electrolux's breach of the Intercreditor Agreement;

2.      A declaration that Electrolux cannot make claims against Wells Fargo or the Debtors asserting a security interest in or other priority to proceeds of sales of Electrolux inventory;

3.      A declaration that Electrolux does not have a prior or superior security interest to that of Wells Fargo with respect to proceeds from sales of Electrolux inventory;

4.      Reasonable and necessary attorneys' fees incurred in connection with this Counterclaim;

5.      Costs of court and other recoverable expenses;

6.      Pre-judgment interest and post-judgment interest; and

7.      All such other relief that that the Court may deem proper.

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

By its attorneys,


/s/ Mark D. Cahill
Mark D. Cahill  mcahill@choate.com
John F. Ventola  jventola@choate.com
Sean Monahan  smonahan@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000

Jay Jaffe  jay.jaffe@faegrebd.com
Terry Hall  terry.hall@faegrebd.com
FAEGRE BAKER DANIELS LLP
600 East 96th Street, Suite 600
Indianapolis, IN 46240
Tel.: (317) 569-9600
Fax: (317) 569-4800

Date: April 27, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2017, a copy of the foregoing Defendant Wells Fargo Bank, National Association's Answer to Plaintiff's First Amended Complaint for Declaratory and Other Relief and Counterclaim Against Electrolux Home Products, Inc. was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

**Counsel for Electrolux Home Products, Inc.**

David H Conaway
dconaway@slk-law.com

David J Coyle
dcoyle@slk-law.com

David M Grogan
dgrogan@slk-law.com

John E Haller
jahller@slk-law.com

Gregory Wagoner
gwagoner@slk-law.com

**Counsel for hhgregg, Inc., HHG Distributing LLC, Gregg Appliances, Inc.**

Adam Arceneaux
adam.arceneaux@icemiller.com

Sarah Lynn Fowler
sara.fowler@icemiller.com

Andrew Joseph Gallo
Andrew.gallo@morganlewis.com

Neil E. Herman
neil.herman@morganlewis.com

Jeffrey A Hokanson
jeff.hokanson@icemiller.com

**Counsel for Hilco Merchant Resources, LLC**

Timothy R. Bow
timothy.bow@kirkland.com

James P Moloy
jmoloy@boselaw.com

Patrick J Nash, Jr.
patrick.nash@kirkland.com

William Bradley Weiland
brad.weiland@kirkland.com

**Counsel for GACP Finance Co., LLC**

Terry E Hall
terry.hall@faegrebd.com

Jay Jaffe
jay.jaffe@faegrebd.com

**U.S. Trustee**

Usptregion10.in.ecf@usdoj.gov


*/s/ Mark D. Cahill*

Exhibit A

EXECUTION

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Intercreditor Agreement") dated as of February 3, 2005 is by and between CONGRESS FINANCIAL CORPORATION (CENTRAL), an Illinois corporation, as Agent, on behalf of itself and the Lenders (as such term is defined below) ("Agent") and ELECTROLUX HOME PRODUCTS, INC. ( successor by merger to WHITE CONSOLIDATED INDUSTRIES, INC.) a Delaware corporation (the "Consignor"). Consignor and Agent are sometimes individually referred to herein as a "Creditor" and collectively as "Creditors."

### W I T N E S S E T H:

WHEREAS, Consignor has entered into a Consignment Agreement, dated September 24, 2003, with Gregg Appliances, Inc., an Indiana corporation ("Borrower") with respect to certain inventory manufactured or distributed by Consignor and sold by Borrower, as more particularly described on Schedule A hereto (the "Consigned Inventory"), as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, the "Consignment Agreement". Pursuant to the terms of the Consignment Agreement all obligations and liabilities of Borrower to Consignor under the Consignment Agreement are to be secured by the Consignment Collateral (as such term is defined below);

WHEREAS, Borrower has entered or is about to enter into financing arrangements with Congress Financial Corporation (Central), in its capacity as agent pursuant to the Revolving Loan Agreement (as hereinafter defined) acting for and on behalf of the financial institutions which are parties thereto as lenders (in such capacity, "Agent") and the financial institutions which are parties to the Loan Agreement as lenders (each individually, a "Lender" and collectively, "Lenders") pursuant to which Agent and Lenders may from time to time make loans and advances and provide other financial accommodations to Borrower secured by, all of the assets and properties of Borrower including all of its accounts, inventory, documents, instruments, chattel paper, general intangibles, contract rights, equipment and the products and proceeds thereof (collectively, the "Revolving Loan Collateral"), as set forth in the Loan and Security Agreement, dated of even date herewith, by and among Agent, Lenders, Borrower and its subsidiaries (as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, the "Loan Agreement") and other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto (collectively, the "Revolving Loan Agreements");

WHEREAS, Creditors desire to enter into this Intercreditor Agreement to confirm the relative priority of the ownership and security interests of each Creditor in the Consignment Collateral and agree upon certain related matters;

NOW, THEREFORE, in consideration of the mutual benefits accruing to Creditors hereunder and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

436393.5

1.    (a) Each Creditor hereby acknowledges and agrees that (1) Consignor has the prior and superior security interest and lien in the (A) Consigned Inventory, and (B) proceeds of such Consigned Inventory but only  to the extent such proceeds consist of either (i) identifiable cash proceeds of Consigned Inventory received by Borrower on or prior to the delivery of the Consigned Inventory to the purchaser thereof, or (ii) proceeds of insurance payable by reason of loss or damage to the Consigned Inventory (the proceeds described in clause (B) of this Section 1(a)(1) together with the Consigned Inventory, are collectively referred to herein as the "Consignment Collateral"), provided, that, the Consignment Collateral shall not include (i) any amounts at any time deposited in or received in the lockbox or blocked account established by Borrower in connection with the Revolving Loan Agreements (whether or not such amounts represent proceeds of Consigned Inventory received by Borrower on or before delivery of the Consigned Inventory to the purchaser thereof) except as set forth in Section 1(b) below, (ii) all accounts, contract rights, and general intangibles arising from credit card purchases by customers of Borrower, and (iii) any other amounts at any time paid to Agent in respect to the obligations of Borrower to Agent or Lenders under the Revolving Loan Agreements, and (2) Consignor does not have and will not obtain a security interest in or lien upon any of the assets of Borrower (including, without limitation, the Revolving Loan Collateral) other than the Consignment Collateral.

(b)  Notwithstanding anything to the contrary set forth Section 1(a) above, to the extent that  (1) a Cash Dominion Event (as such term is defined on Schedule B hereto) has occurred and is continuing and (2) Consignor notifies Agent, in writing (such request to be accompanied by the Report (as such term is defined in Section 7(a) of the Consignment Agreement as in effect on the date hereof) with respect to Consigned Inventory in respect of which Consignor has not been paid), that cash proceeds with respect to Consigned Inventory have been deposited into or received into the lockbox or blocked account (such written request to have been received by Agent no later than one (1) week after any such amounts were due and payable by Borrower to Consignor in accordance with Section 7 of the Consignment Agreement (as in effect on the date hereof), then and in such event, Agent shall, to the extent permitted by applicable law, pay over to Consignor the amount of such proceeds, provided, that, in the event that Consignor does not have a valid, enforceable and perfected security interest in the Consignment Collateral, Borrower hereby agrees that Agent shall not have any liability to Borrower or any Obligor (as such term is defined in Schedule B hereto) and Borrower and each Obligor hereby waive and release Agent from any claims, actions or proceedings as a result of the payment of such proceeds to Consignor.  Borrower and each Obligor acknowledges and agrees that Agent may make such advances on behalf of and for the account of Borrower to Consignor in the event that Agent is required to make any payments to Consignor on account of proceeds of Consigned Inventory or as may otherwise be required herein (and Agent may charge the loan account of Borrower with such amounts), even if after giving effect thereto there are no further loans available to Borrower under the Loan Agreement (and notwithstanding any dispute or claim between Borrower or any Obligor and Consignor) and Borrower and Obligors hereby waive and release any claim against any Agent and Lenders (as such term is defined in the Loan Agreement) as a result of such payment.  Consignor represents and warrants to Agent that Consignor invoices Borrower no less frequently than once per calendar week for the sales of Consigned Inventory for the previous week and shall continue such procedures so long as this Agreement is in effect.

2.        Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest, the ownership and security interest in and liens upon the Consignment Collateral of Consignor have and shall have priority over the security interests in and liens upon the Consignment Collateral of Agent, if any.  Agent agrees that it will not contest the validity, perfection, priority or enforceability of the liens of Consignor upon the Consignment Collateral.  Consignor agrees that it will not contest the validity, perfection, priority or enforceability of the liens upon the Revolving Loan Collateral of Agent.

3.        Notwithstanding anything to the contrary set forth in the Consignment Agreement and in furtherance of the agreements of Consignor in Section 1 hereof, Consignor confirms and agrees: (a) no present or future obligations, liabilities or indebtedness of Borrower to Consignor, other than the obligations of Borrower to Consignor arising under the Consignment Agreement (collectively, the "Consignment Obligations"), are or shall be secured by the Consignment Collateral, and to the extent the Consignment Agreement creates or might be deemed to create a lien or security interest in the Consignment Collateral to secure any such obligations, liabilities, or indebtedness, Consignor hereby waives and relinquishes and agrees not to assert such lien or security interest; and (b) Consignor does not claim, hereby waives and relinquishes, and agrees not to assert any lien, security interest, or other interest in accounts or general intangibles (each as defined in the Uniform Commercial Code) of Borrower, including without limitation, accounts and general intangibles that constitute proceeds of Consigned Inventory except as set forth in Section 1(b) hereof, and agrees that Borrower's accounts and general intangibles shall not in any event constitute part of the "Consignment Collateral".  Consignor further represents and warrants to Agent that as of the date of this Agreement, Borrower is not in default in respect of the Consignment Agreement or with respect to any Consignment Obligations.  Consignor agrees that upon the request of Agent it will execute whatever is reasonably requested by Agent to acknowledge and confirm that Consignor has no lien on the Revolving Loan Collateral.

4.        Consignor hereby waives any and all rights to have any Collateral (including without limitation the Consignment Collateral) or any part thereof granted to Agent marshalled upon any foreclosure or other disposition of such Collateral by Agent or Borrower.

5.        Consignor represents and warrants that the Consignment Agreement annexed hereto as Exhibit A is in full force and effect as of the date hereof, and no default exists thereunder.

6.        Each Creditor shall give to the other Creditor concurrently with the giving thereof to Borrower, (a) a copy of any written notice by such Creditor of either a default or an event of default under its Agreements with Borrower, or written notice of demand of payment from Borrower, and (b) any written notice sent by a Creditor to Borrower at any time an event of default under such Creditor's agreements with Borrower exists stating such Creditor's intention to exercise any of its enforcement rights or remedies, including written notice pertaining to any foreclosure on any of the Collateral or Consignment Collateral, as the case may be, or other judicial or non-judicial remedy in respect thereof, and any legal process served or filed in connection therewith; provided, that, the failure of any party to give notice as required hereby shall not affect the relative priorities of Creditors' respective liens as provided herein or the validity or effectiveness of any such notice as against Borrower.  Agent shall have the right and

436393.5                                              3

opportunity, but not the obligation, to cure any Borrower default under the Consignment Agreement within ten (10) days after the receipt by Agent of such notice. Any payment made or act done by Agent to cure any such default shall not constitute an assumption of any of the agreements between Borrower and Consignor or any obligations thereunder. In addition, upon the reasonable prior written request of Agent, Consignor shall also provide Agent with copies of monthly statements with respect to Consigned Inventory and amounts due to Consignor from Borrower. Borrower hereby authorizes and consents to each of Creditors sending any such notices (as well as Agent information requests) to the other Creditor.

7.    Intentionally Deleted.

8.    This Intercreditor Agreement shall be applicable both before and after the filing of any petition by or against Borrower under the U.S. Bankruptcy Code and all converted or succeeding cases in respect thereof, and all references herein to Borrower shall be deemed to apply to a trustee for Borrower and Borrower as debtor-in-possession. The relative rights of Agent and Consignor to repayment of indebtedness owed to Agent and Lenders in respect of the Revolving Loan Agreements and the repayment to Consignor of the Consignment Obligations, respectively, and in or to any distributions from or in respect of Borrower or any Revolving Loan Collateral or proceeds of Consignment Collateral, respectively, shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order.

9.    Intentionally Deleted.

10.    This Intercreditor Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of each of Creditors and its respective successors, participants and assigns.

11.    All notices, requests and demands to or upon the respective parties hereto shall be in writing and shall be deemed duly given, made or received: if by facsimile transmission, immediately upon sending and upon confirmation of receipt, or if by nationally recognized overnight courier service with instructions to deliver the next business day, one (1) business day after sending if sent to the parties at their addresses set forth below or to such other address or person as shall be designated from time to time by notice.

12.    Except as expressly provided in Section 10 hereof, this Intercreditor Agreement is solely for the benefit of the Creditors and their respective successors, participants and assigns, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Intercreditor Agreement.

13.    This Intercreditor Agreement may be executed in any number of counterparts, each of which shall be an original with the same force and effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed signature page to this Intercreditor Agreement shall be as effective as delivery of a manually executed counterpart hereof

14.    The validity, construction and effect of this Intercreditor Agreement shall be governed by the internal laws of the State of New York but excluding any principles of conflicts

436393.5                                                4

of law or other rule of law that would result in the application of the law of any jurisdiction other than the laws of the State of New York.

15.     This Intercreditor Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full of all obligations and liabilities of Borrower under the Revolving Loan Agreements and the termination of the financing arrangements between Agent and Lenders and Borrower.

16.     This Intercreditor Agreement is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.

17.     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY CONSENTS TO THE NON EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK FOR NEW YORK COUNTY AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS INTERCREDITOR AGREEMENT.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

ELECTROLUX HOME PRODUCTS, INC.

By: _____
Title: _____

Address:  20445 Emerald Parkway S.W., #250
          P.O.Box 35920
          Cleveland, OH 44135
          Attn: General Counsel
          Telecopy: 216-898-2340

          with a copy to:

          250 Bobby Jones Expressway
          Augusta, GA 30907
          Attn: President
          Telecopy: 706-651-7769

CONGRESS FINANCIAL CORPORATION (CENTRAL), as Agent

By: _____
Title: _____

Address:  150 South Wacker Drive
          Suite 2200
          Chicago, Illinois 660606-4401
          Attn: Portfolio Manager -- Gregg
                Appliances, Inc.
          Telecopy: 312-332-0424

The undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

The undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

GREGG APPLIANCES, INC.

By: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

ELECTROLUX HOME PRODUCTS, INC.

CONGRESS FINANCIAL CORPORATION (CENTRAL), as Agent

By: _____
Title: _____

By: _Vicky L Balmot_
Title: __**Executive Vice-President**__

Address:  20445 Emerald Parkway S.W., #250
          P.O.Box 35920
          Cleveland, OH 44135
          Attn: General Counsel
          Telecopy: 216-898-2340

          with a copy to:

          250 Bobby Jones Expressway
          Augusta, GA 30907
          Attn: President
          Telecopy: 706-651-7769

Address:  150 South Wacker Drive
          Suite 2200
          Chicago, Illinois 660606-4401
          Attn: Portfolio Manager – Gregg
              Appliances, Inc.
          Telecopy: 312-332-0424

The undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

The undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

GREGG APPLIANCES, INC.

By: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

ELECTROLUX HOME PRODUCTS, INC.

By:_____
Title:_____

CONGRESS FINANCIAL CORPORATION (CENTRAL), as Agent

By:_____
Title:_____

Address:  20445 Emerald Parkway S.W., #250
          P.O.Box 35920
          Cleveland, OH 44135
          Attn: General Counsel
          Telecopy: 216-898-2340

          with a copy to:

          250 Bobby Jones Expressway
          Augusta, GA 30907
          Attn: President
          Telecopy: 706-651-7769

Address:   150 South Wacker Drive
           Suite 2200
           Chicago, Illinois 660606-4401
           Attn: Portfolio Manager -- Gregg
               Appliances, Inc.
           Telecopy: 312-332-0424

The undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

The undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the opinion of any Creditor to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

GREGG APPLIANCES, INC.

By:_____
Title:___CHAIRMAN___
          CEO

Schedule A
Consigned Inventory

All inventory located at any of Borrower's locations which is manufactured or distributed by Consignor, now existing or hereafter acquired, including but not limited to all Tappan and/or Frigidaire brand refrigerators, freezers, air conditioners, dehumidifiers, clothes washers, clothes dryers, ranges, stoves, dishwashers, humidifiers, and other kinds of household and commercial appliances, and replacement parts consigned to Borrower by Consignor.

Schedule B
Additional Definitions

"Cash Dominion Event" shall mean either (a) an Event of Default (under the Revolving Loan Agreements) shall exist or have occurred and be continuing or (b) the period commencing on any date on which Excess Availability (as such term is defined in the Revolving Loan Agreements) is less than $8,500,000 (other than any period commencing the date that any payment of interest is made by Borrower under the Senior Note Indenture and ending five (5) Business Days thereafter) and ending on a Cash Dominion Reversion.

"Cash Dominion Reversion" shall mean with respect to the first two (2) Cash Dominion Events in any twelve (12) month period, that Excess Availability (as such term is defined in the Revolving Loan Agreements) has been equal to or greater than $8,500,000 for sixty (60) consecutive days, provided, that, if a third Cash Dominion Event occurs during such twelve (12) month period, a Cash Dominion Reversion will occur only in the event that Excess Availability has been equal to or greater than $8,500,000 for three hundred sixty (360) consecutive days (as such term is defined in the Revolving Loan Agreements).

"Obligor" shall mean any guarantor, endorser, acceptor, surety or other person liable on or with respect to the Obligations (as such term is defined in the Revolving Loan Agreements) or who is the owner of any property which is security for the Obligations (as such term is defined in the Revolving Loan Agreements, other than Borrower.

436393.5

8