**SO ORDERED: May 31, 2018.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HHGREGG, INC., *et al.*[1], | ) | Case No. 17-01302-JJG-11 |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| ELECTROLUX HOME | ) | |
|   PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 17-50098 |
| | ) | |
| HHGREGG, INC., | ) | |
| GREGG APPLIANCES, INC., | ) | |
| HHG DISTRIBUTION, LLC, | ) | |
| WELLS FARGO BANK, N.A., and | ) | |
| GACP FINANCE CO., LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  hhgregg, Inc. (0538); Gregg Appliances, Inc. (9508); and HHG Distributing LLC (5875).

## AMENDED ORDER ON DEFENDANTS'
## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Defendants hhgregg, Inc., HHG Distributing LLC and Gregg Appliances, Inc. (together, "Debtors") and Wells Fargo Bank, N.A. ("Wells Fargo") have each filed a *Motion for Partial Summary Judgment* (respectively, the "Debtor Motion" and the "Wells Motion" and together, the "Motions")[2] on Plaintiff Electrolux Home Products, Inc.'s ("Electrolux") *First Amended Complaint for Declaratory and Other Relief* (the "Amended Complaint"). GACP Finance Co., LLC ("GACP") intervened as a defendant in this proceeding and joined in the Wells Motion. Having reviewed the parties' respective submissions, the Court enters the following Amended Order.[3]

## STATEMENT OF UNDISPUTED FACTS

Prior to filing voluntary Chapter 11 petitions on March 6, 2017 (the "Petition Date"), Debtors operated approximately 220 brick-and-mortar stores selling premium appliances, consumer electronics and home products. Debtors' reorganization efforts proved unsuccessful, and Debtors have liquidated substantially all their inventory, including the inventory at issue in this proceeding.

---

[2] The Debtor Motion seeks summary judgment on Counts I-III, V-VII, IX, X and XII. The Wells Motion seeks summary judgment on Counts I, IV, VI-VIII, and X-XIV, as well as parts (c) and (d) of Count II. Electrolux has since dismissed Counts II, V, and IX. Where possible, the Court will discuss together Debtors' and Wells Fargo's respective arguments on the Counts on which they both seek summary judgment.

[3] In its original Order, the Court inadvertently failed to discuss Wells Fargo's request for summary judgment on Count XI of the Amended Complaint. The Court remedies that error by way of this Amended Order.

2

## The Consignment Agreement

Debtors received certain goods on consignment from Electrolux (the "Consigned Inventory") [4] pursuant to a Consignment Agreement (the "Consignment Agreement"). [5] The Consigned Inventory largely consisted of consumer and commercial appliances, including Electrolux, Electrolux ICON, Gibson, Kelvinator, Tappan, and Frigidaire brands. [6]

Per the Consignment Agreement, Debtors and Electrolux acknowledged and agreed that all right, title, and interest in and to all of the Consigned Inventory remained with Electrolux.  The Consignment Agreement specifically provides:

> The Consignor shall at all times retain title to all Consigned Merchandise.  Upon the sale of the Consigned Merchandise; title to the proceeds shall vest in and remain the property of the Consignor until the Consignor is paid in full pursuant to the terms of this Agreement. The Consignee agrees to hold the Consigned Merchandise in trust for the Consignor as Consignor's property, for the sole purpose of selling the Consigned Merchandise and the Consigned Merchandise shall only be sold by the Consignee in its ordinary course of business. The Consigned Merchandise shall at all times be subject to the direction and control of the Consignor, and upon demand by the Consignor, the Consignee shall return any unsold Consigned Merchandise to the Consignor.
>
> In order to secure Consignor with respect to the Consigned Merchandise and any and all moneys due to the Consignor herein, the Consignee . . . [agrees] . . . . to execute and/or permit to be filed any . . . documents  . . .to perfect the Consignor's ownership interest in the Consigned Merchandise and the proceeds thereof.

---

[4]  Hereinafter, the Court refers to the commercial arrangement between Debtors and Electrolux as the "Transaction."

[5]  The Consignment Agreement is governed by North Carolina law.

[6]  Electrolux was one of only two suppliers that provided inventory to Debtors on consignment.  On average, less than 6% of Debtors' total inventory consisted of consigned good.  Over 99% of the products delivered to Debtors by Electrolux in the year proceeding the Petition Date were delivered in shipments with aggregate values in excess of $1,000.

*Consignment Agreement* at §§ 2 and 5.  Debtors agreed to "keep the Consigned Merchandise, and the proceeds thereof, separate and capable of identification, as the property of Consignor" and to "report to the Consignor sales of the Consigned Merchandise." *Id.* at § 6.

The Consignment Agreement states that the Consigned Inventory "shall remain free and clear of all liens, security interest, claims, and encumbrances[]" and that "[n]one of the Consigned Merchandise is subject to any lien, encumbrances, security interests, or claims[]," and that "[n]one of the Consigned Merchandise is subject to any lien, encumbrances, security interests, or claims *except as set forth in Exhibit 'C' attached hereto and incorporated herein.*" *Id.* at § 3(e), (f) and (g) (italics added).  Alas, no party provided the Court with a copy of Exhibit C.  Finally, the Consignment Agreement also explicitly contemplates that Debtors could pledge the Consigned Inventory as collateral with Electrolux's written consent.  *Id.* at § 3(h).

With regard to payment, the Consignment Agreement provides:

On every Tuesday (for all sales for the previous week ending Sunday), Consignee shall send a written report to Consignor setting forth the sales of Consigned Merchandise, by model and location (the "Report"). Within one (1) day from the date of each Report, Consignee shall make payment to Consignor, via Consignor's designated on-line payment system for Consignees, in an amount equal to the Consigned Merchandise Cost (as defined herein). As used herein, the term "Consigned Merchandise Cost" shall mean the sum of (i) the Consigned Merchandise prices as set by Consignor and (ii) shipping costs. The Consigned Merchandise Cost shall be at the current established price.

Within three (3) business days of the end of each calendar month, Consignee shall send a written report to Consignor summarizing the value of the unsold Consigned Merchandise in Consignee's possession by Location. In the event that Consignee's aggregate balance of

Consigned Merchandise is less than Consignee's aggregate open invoice balance as prepared by Consignor, or any items of Consigned Merchandise are found missing, Consignee shall immediately pay Consignor, via Consignor's designated on-line payment system, the Consigned Merchandise Cost for such shortfall within seven (7) days of the date of such report. In addition, in the event that such report discloses that the aggregate balance of Consigned Merchandise is overstated exclusive of defective units and returns, Consignee shall deduct the value of the overage from any payment otherwise owed to Consignor.

*Id.* at § 7(a) and (b).

Finally, Debtors were to return all unsold inventory to Electrolux upon termination of the Consignment Agreement. *Id.* at § 12(b).

Debtors ultimately rejected the Consignment Agreement. By that time, Debtors had sold substantially all of the Consigned Inventory.

### Electrolux's Financing Statements

Electrolux filed an initial UCC-1 Financing Statement with the Indiana Secretary of State on December 19, 2001 which purports to cover all the Consigned Inventory (the "Initial Financing Statement"). On June 22, 2006 and July 19, 2011, Electrolux filed continuation statements with the Indiana Secretary of State.

Electrolux did not file another continuation statement after July 10, 2011, meaning that the Initial Financing Statement lapsed on December 19, 2016. Electrolux then filed a new initial financing statement on March 2, 2017 (the "Second Initial Financing Statement").

### Debtors' Pre- and Post-Petition Inventory Financing

Prepetition, Wells Fargo, acting as administrative agent and collateral agent for certain financial institutions, entered into an Amended and Restated Loan and

Security Agreement with certain of the Debtors (as previously and subsequently amended and restated, the "Prepetition Credit Agreement").[7]  In consideration for the extension and maintenance of certain credit facilities, Debtors granted to Wells Fargo, as agent, a comprehensive security interest in substantially all of Debtors' property and assets, whether now owned or after acquired (the "Collateral"), including, without limitation, "Accounts," "Inventory" and the proceeds and products thereof. The Prepetition Credit Agreement, as amended, remained effective as of the date of the Petition Date, with approximately $56 million due and outstanding to the lenders.

Pursuant to an Order dated March 7, 2017 (the "Interim DIP Order"), the Court granted Debtors authority to obtain up to $80,000,000 in secured financing (the "DIP Credit Agreement")[8] with Wells Fargo as the administrative agent and collateral agent and GACP as FILO Agent (the "DIP Lenders") and to utilize Wells Fargo's cash collateral. Pursuant to the Interim DIP Order and as consideration for the DIP Loan, the DIP Lenders were granted "priming first priority" liens on virtually all of Debtors' assets, including existing and after-acquired inventory, and the proceeds thereof (the "DIP Liens"). The DIP Liens were effective as of the Petition Date. The DIP Lenders were also granted a super-priority administrative expense claim. Wells Fargo, in turn, was granted adequate protection in the form of a replacement lien on Debtors' assets, subordinate only to DIP Liens (the

---

[7]  The Prepetition Credit Agreement is governed by New York law.
[8]  Together, the Prepetition Credit Agreement and DIP Credit Agreement are referred to herein as the "Credit Agreements."

"Replacement Liens"), and a super-priority administrative claim subordinate only to the DIP Lenders' administrative claim and a carve out for certain professional fees.

On May 2, 2017, the Court entered a final order (the "Final DIP Order") (together, the Interim DIP Order and Final DIP Order are hereinafter referred to as the "DIP Orders"), which among other things, approved the DIP Loan on a final basis and authorized the use of Wells Fargo's cash collateral, granted the DIP Liens and Replacement Liens, and granted Wells Fargo and the DIP Lenders super-priority administrative claims

Pursuant to the terms of the DIP Orders, Debtors were to use the DIP Credit Agreement to repay the outstanding indebtedness to Wells Fargo under the Prepetition Credit Agreement – over $56 million – and to finance Debtors' ongoing post-petition operations.

### The Intercreditor Agreement

On February 3, 2005, Electrolux, as Consignor, and Congress Financial Corporation, as Agent for certain secured lenders, entered into an Intercreditor Agreement (the "Intercreditor Agreement").[9]  Wells Fargo is the successor-in-interest to Congress Financial Corporation under the Intercreditor Agreement.

The Intercreditor Agreement provides in relevant part that Electrolux, as Consignor, has the prior and superior security interest and lien in the "Consignment Collateral," which includes, in relevant part:  "(A) Consigned

---

[9]  Gregg Appliances, Inc. ("Gregg") is a signatory, but not a party, to the Intercreditor Agreement. Per Gregg's signed acknowledgement, Gregg agreed to be bound by the Intercreditor Agreement but notes that it "will not receive any right, benefit, priority or interest under."

Inventory; and (B) proceeds of such Consigned Inventory, but only to the extent such proceeds consist of either (i) identifiable cash proceeds of Consigned Inventory received by Debtors on or prior to the delivery of the Consigned Inventory to the purchaser thereof." *Intercreditor Agreement* at § 1(a).  Consignment Collateral excludes, among other items, "any amounts at any time deposited in or received in the lockbox or blocked account established by [Debtors] in connection with the Revolving Loan Agreements (whether or not such amounts represent proceeds of Consigned Inventory received by [Debtors] on or before delivery of the Consigned Inventory to the purchaser thereof) . . . [and] all accounts, contract rights, and general intangibles arising from credit card purchases by customers of [Debtors]." *Id.*

The Intercreditor Agreement defines a procedure whereby Electrolux can make a demand upon Wells Fargo for proceeds from Electrolux Inventory that have been deposited into a lockbox or a blocked account.  Among other requirements, as detailed below, the demand must be made in writing and within one week from the time such amounts were past due pursuant to the terms of the Consignment Agreement.  *Id.* at §1(b).

Electrolux did not deliver any type of notice to Wells Fargo pertaining to the Intercreditor Agreement until March 31, 2017 (the "March 31st Notice").  Electrolux delivered seven subsequent notices to Wells Fargo under the Intercreditor Agreement from April 4, 2017 through May 25, 2017 (together, the "Notices").  The Notices each state that "[c]ash proceeds with respect to the Consigned Inventory of

Electrolux have been deposited into or received into the Agent's lockbox or blocked account . . . ." Each of the Notices also has attached to it a copy of the "Report" that is referred to and defined by the § 7 of the Consignment Agreement.

### Inventory Sales

The Court granted Debtors interim authority to conduct going-out-of-business sales per an order dated March 13, 2017 (the "Interim GOB Order").  The authorization to sell did not extend to consigned inventory.

Instead, the Court entered an interim order the same day that "authorized, but not directed, [Debtors] in their business judgment, to continue, maintain, implement new, and/or terminate" its consignment arrangements "in the ordinary course of business and in a manner consistent with past practice . . . ."  The Court approved such authorization on a final basis on April 3, 2017 (together, the Court's interim and final orders shall be referred to as "the Consignment Order").

The Consignment Order further provided that "any payment made or to be made under this Order, any authorization contained in this Order, or any claim for which payment is authorized hereunder, shall be subject to the requirements imposed on the Debtors under any orders of this Court approving any debtor in possession financing for, or any use of cash collateral by, the Debtors, and any documents providing such debtor in possession financing."  Finally, the Consignment Order states that "[n]othing in this Order (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or any admission as to the validity of any claim against the

Debtors and their estates, (b) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (c) shall be construed as a promise to pay a claim."

Following entry of these orders, Debtors sold inventory, including the Consigned Inventory. Proceeds from the sale of the Consigned Inventory were commingled with other sales proceeds in accounts maintained with, or under the control or dominion of, the DIP Agent and were swept by Debtors' secured lenders on a daily basis.

On April 7, 2017, the Court entered a final order approving Debtors' going-out-of-business sale motion. (the "Final GOB Sale Order"). Pursuant to the Final GOB Sale Order, the Court authorized the "Phase II" sale of Debtors' remaining inventory, including the Consigned Inventory. Such sales were approved without prejudice to any senior rights that Electrolux had in the Consigned Inventory and such rights were to attach to the sale proceeds to the same extent and priority that Electrolux enjoyed as of the Petition Date, subject to the terms of the Intercreditor Agreement.

The Final GOB Sale Order also provided the following:

Notwithstanding anything in this Order, the Interim Order Authorizing the Debtors to Continue the Conduct of Store Closing Sales (Doc. No. 137), or the Consulting Agreement to the contrary, the Debtors shall, in the normal course of its business, report to DIP Lenders and Electrolux its sales of any Electrolux products (the "Electrolux Products"). DIP Lenders shall, for the period April 7, 2017 through April 17, 2017, and when received and as reported by the Debtors, segregate all proceeds from the Debtors' sale of Electrolux

Products, which proceeds shall be held pending further Order of the Court. As indicated in open court, all parties' rights and interests in and to the Electrolux Products and the proceeds thereof are expressly reserved.

Pursuant to this provision, Debtors have segregated $6,248,714—at least as of July 14, 2017 (the "Segregated Funds"). Pursuant to an *Agreed Entry* entered into by the parties and approved by the Court in the underlying bankruptcy case, $78,646.18 of the Segregated Proceeds have been released to Debtors.

Substantially all of Consigned Inventory has been sold or otherwise distributed by Debtors. As of mid-July, Debtors' inventory included approximately $65,000 worth of Consigned Inventory, consisting of scrap or damaged inventory. This inventory has been provided to a third-party liquidator and is in the process of being sold.

### Electrolux's Motion for Injunctive Relief

On March 20, 2017, Electrolux filed a *Motion for Temporary Restraining Order and Preliminary Injunction* (the "TRO Motion"). Per the TRO Motion, Electrolux sought to enjoin: (1) Debtors, among others, from selling the Consigned Inventory for a price less than what Debtors were required to pay under the Consignment Agreement; (2) Debtors from paying Wells Fargo any portion of proceeds from the sale of Consigned Inventory; and (3) Wells Fargo from receiving and/or applying sale proceeds to any obligation owed by Debtors without Electrolux first being paid any amount due under the Consignment Agreement.

Following extensive briefing and a hearing, the Court denied the TRO Motion. In the order, the Court indicated that it had "from the bench suggested

11

possible accommodations that could be made to preserve [Electrolux's] interest in the inventory" and further expressed its "trust that the parties [would] continue to explore such accommodations."

## Debtors' Counterclaims

Debtors have asserted counterclaims (the "Counterclaims") against Electrolux under 11 U.S.C. §§ 544 and 547 to avoid Electrolux's allegedly unperfected security interest in the Consigned Inventory and to recover certain allegedly preferential payments made by Debtors to Electrolux in the 90 days preceding the Petition Date; for breach of certain Vendor Support Agreements under which Debtors argue that Electrolux owes $1,767,566.75 in payments; and for disallowance of claims pursuant to § 502(d).

To date, neither party has sought summary judgement on the Counterclaims.

## DISCUSSION AND DECISION

## Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the

moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" to cite evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322-23. If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material question, then the court must enter summary judgment against it. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986)).

### Ownership of Consigned Inventory

Both Debtors and Wells Fargo seek summary judgment on Electrolux's First Cause of Action ("Count I"), wherein Electrolux asserts:

> There is a bona fide, actual, present, and practical need for a declaration regarding the ownership rights of the Electrolux Consignment Inventory, the rights of [Debtors] to sell the Electrolux Consignment Inventory, the rights of Electrolux to the proceeds of the sales of the Electrolux Consignment Inventory, and the right of Electrolux to regain possession of the Electrolux Consignment Inventory.

In their supporting summary judgment brief, Debtors argue that the Consignment Agreement is governed by Article 9 of the Uniform Commercial Code (the "UCC") in that the Transaction meets § 9-102(a)(20)'s definition of "consignment."[10] From

---

[10] Debtors argue in their reply brief that the issue of ownership is "moot" because all of the Consigned Inventory has been sold and that there is therefore no need to determine Electrolux's "ownership." The Court concedes that part of Electrolux's prayer for relief under Count I is moot to the extent it seeks a declaration that Debtors were not authorized to sell the Consigned Inventory and that Electrolux is entitled to recover possession of the Consigned Inventory as the property has since been sold. The Court disagrees however that the overarching issue of "ownership" is entirely moot as the Court must examine the nature of the Transaction to determine the parties' respective rights. It is perhaps safer to

there, Debtors focus on the priority dispute between Electrolux and Wells Fargo and on whether Electrolux's security interest in the Consigned Inventory was unperfected and/or subject to avoidance under 11 U.S.C. § 547.

In response, Electrolux argues that "[t]here are material facts in dispute as to whether Electrolux was the sole owner of the Consigned Inventory, whether it was the sole owner of the proceeds, and concerning the potential impact of the Intercreditor Agreement and the parties' course of dealing thereunder . . . ." such that summary judgment should be denied. Electrolux further argues that its transaction with Debtors is not a "consignment" governed by Article 9. Rather, Electrolux posits that the Consignment Agreement "granted Electrolux a security interest in and to the Consignment Inventory that secures a payment obligation" thereby removing it from Article 9.[11] Electrolux contends that because Debtors did not "own" the Consigned Inventory, they "did not have the right to grant Wells Fargo a lien in the Consigned Inventory."

To address the parties' respective positions, the Court starts with whether the Transaction is an Article 9 consignment and, if not, whether it is nevertheless governed by Article 9.

---

say that "ownership" of the Consigned Inventory is not fully determinative of the parties' respective rights in the Consigned Inventory or the proceeds thereof.

[11] In its response brief, Electrolux also argues that the Transaction is a "true consignment." Subsequent to filing its response brief, Electrolux dismissed the claim asserted in its Amended Complaint that the Consignment Agreement created a "true consignment" and the Court will therefore not discuss that argument. But Article 9 now covers most "true consignments", notwithstanding Electrolux's argument. The Court further notes that in its response brief, Electrolux seems to equate a "true consignment" with a consignment intended as security. The two are different animals, although they may ultimately lead to the same result in that Article 9 applies to both.

14

Under the UCC, "consignment" means a transaction, regardless of form, in which a person delivers goods to a merchant for the purpose of sale and:

(A)    The merchant:

    (i)    deals in goods of that kind under a name other than the name of the person making delivery;

    (ii)    is not an auctioneer; and

    (iii)    is not generally known by its creditors to be substantially engaged in selling the goods of others;

(B)    with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery.

(C)    the goods are not consumer goods immediately before delivery;

(D)    the transaction does not create a security interest that secures an obligation.

N.C. GEN. STAT. § 25-9-102(a)(20). If the consignment meets the UCC definition, the consignor obtains a purchase money security interest ("PMSI") in the consigned goods. *Id.* at § 9–103(d).

Electrolux seemingly concedes the Transaction meets the requirements of § 102(a)(20)(A)-(C)[12] It instead argues that the Transaction is outside of Article 9's definition of consignment because it was "consignment intended for security." In support of that position, Electrolux emphasizes that Debtors were required under

---

[12] Debtors concede that a small number of shipments from Electrolux to Debtors were for goods worth less than $1000 but they argue that UCC § 9-102(a)(2) should apply to these because the reason for the $1000 limit should not apply where, as there, the great bulk of the deliveries at issue were for more than $1000.

the Consignment Agreement to make weekly payments to Electrolux for the inventory sold in the previous week.

That argument misses the mark. By Electrolux's logic, nearly every consignment would be intended as security as the Court presumes that the consignor expects the consignee to pay for goods sold.  Far more significant is the fact that under Consignment Agreement, Debtors are allowed to return unsold goods to Electrolux rather than pay Electrolux for them.  This fact alone leads the Court to reject Electrolux's argument and conclude that the Transaction is a "consignment" under UCC § 9-102(a)(20).[13]

Unfortunately, this conclusion does not answer the question of whether Electrolux owns the Consigned Inventory.  At least as between Electrolux and Debtors, Electrolux retained title to the goods.  *See In re Valley Media, Inc.*, 279 B.R. 105, 123 (Bankr. D. Del. 2002) (application of revised Article 9 does not affect the ownership rights of the consignor *relative to the consignee*).  For that reason, the Court denies Debtors' Motion to the extent it seeks summary judgment on Electrolux's claim of ownership of the Consigned Inventory.  That said, ownership is not particularly determinative of the issues before the Court.

Section 9–319(a) of the UCC provides that "for purposes of determining the rights of creditors of . . . a consignee, while the goods are in possession of the

---

[13]  Electrolux's argument also fails to appreciate that consignments intended for security are nevertheless subject to Article 9.  *See* N.C. GEN. STAT. § 25-9-10(a)(1) (Article 9 applies to any transactions, regardless of form, that creates a security interest in personal property or fixtures by contract).

consignee, the consignee is deemed to have the rights and title to the goods identical to those the consignor had or had power to transfer." N.C. GEN. STAT. § 25-9-319. "This fiction allows the consignee's creditors to attach the consigned goods as if the consignee actually had title to the goods." *Valley Media*, 279 B.R. at 123.

To maintain priority in the consigned goods, a consignor must perfect its PMSI prior to the delivery of the goods. *See* N.C. GEN. STAT. § 25-9-324(b). A perfected consignor's PMSI qualifies as an exception to the "first in time, first in right" rule. *See generally,* UCC § 9-317. To the extent the consignor fails to timely perfect its PMSI, the consigned goods are subject to competing claims of other secured creditors of the consignee and priority is determined by reference to the UCC. *See Valley Media*, 279 B.R. at 123, n.30. In the context of a bankruptcy, a trustee or debtor-in-possession may exercise its strong-arm powers under 11 U.S.C. § 544(a). *Id.* at 132 (consignee may not assert ownership rights against the debtor-in-possession as a hypothetical lien creditor of debtor). Therefore, while a consignor that failed to protect its interest might prevail over a secured creditor of the consignee who had actual knowledge of the consignment, that consignor will not prevail over a debtor-in possession or trustee exercising its powers pursuant to 11 U.S.C. § 544(a). *See id.* (citation omitted).

So, while Electrolux may have had ownership rights in the Cosigned Inventory relative to the Debtors prepetition, such ownership is not determinative of Debtors' post-petition rights in the Cosigned Inventory pursuant to its strong-arm powers (which have been asserted by Debtors per the Counterclaims but are not

17

directly at issue here) or to Debtors' other secured creditors, Wells Fargo included. While the Court denies Debtors' request for summary judgment to this extent, it emphasizes that ownership of the Consigned Inventory is largely irrelevant in this proceeding going forward.

**Ownership of Sale Proceeds and**
**Wells Fargo's Alleged Breach of the Intercreditor Agreement**

Within Count I, Electrolux also argues that it is owns and is entitled to the proceeds from the sale of Consigned Inventory. That claim overlaps with Electrolux's Fourth Cause of Action for Wells Fargo's breach of the Intercreditor Agreement ("Count IV"), as both counts depend on whether Wells Fargo or Electrolux has superior rights in the Consigned Inventory and proceeds thereof and whether Electrolux properly invoked its rights under the Intercreditor Agreement. For that reason, the Court discusses both Count I—as it relates to the proceeds— and Count IV together.

On summary judgment, Wells Fargo concedes that Electrolux's lien in the Consigned Inventory is superior to Wells Fargo's interests pursuant to the clear and binding terms of the Intercreditor Agreement. Wells Fargo's concession, however, does not extend to proceeds from the sale of Consigned Inventory.

As previously stated, the Intercreditor Agreement states that Electrolux's superior lien extends only to "identifiable cash proceeds." *Intercreditor Agreement* at § 1(a). The Intercreditor Agreement further states that Electrolux's superior lien does not extend to "amounts deposited at any time in or received in the lockbox or

18

blocked account established by [Debtors] . . . ." or to "accounts, contract rights, and general intangibles arising from credit card purchases by [Debtors'] customers." *Id.*

Rather, to exercise its lien rights in proceeds from the sale of Consigned Inventory, Electrolux was required to provide a written notice to Wells Fargo. More specifically, the Intercreditor Agreement provides:

> Notwithstanding anything to the contrary set forth [in] Section 1(a) above, to the extent that (a) a Cash Dominion event (as such terms is defined on Schedule B hereto) has occurred and is continuing and (2) Consignor notified Agent, in writing (such request to be accompanied by the Report (as such terms is defined in Section 7(a) of the Consignment Agreement . . .) with respect to Consigned Inventory in respect of which Consignor has not been paid that cash proceeds with respect to the Consigned Inventory have been deposited into or received into the lockbox or blocked account (such written request to have been received by Agent no later than one (1) week after such amounts were due and payable by Borrower to Consignor in accordance with Section 7 of the Consignment Agreement . . . then and in such event, Agent shall, to the extent permitted by applicable law, pay over to Consignor the amount of such proceeds….

*Id.* at § 1(b).

> In relevant part, the Intercreditor Agreement further provides that:

> Each Creditor shall give to the other Creditor concurrently with the giving thereof to Borrower, (a) a copy of any written notice by such Creditor of either a default or an event of default under its Agreements with Borrower; or written notice of demand of payment from Borrower, and (b) any written notice sent by a Creditor to Borrower at any time an event of default under such Creditor's agreement with Borrower exists stating such Creditor's intention to exercise any of its enforcement rights or remedies . . .  provided, that, the failure of any party to give notice as required hereby shall not affect the relative priorities of Creditors' respective liens as provided herein or the validity or effectiveness of any such notice as against Borrower.

*Id.* at § 6. Electrolux delivered the Notices to Wells Fargo, the first being on March 31, 2017. Wells Fargo argues, however, that the March 31st Notice and the Notices

19

that followed are all defective in that do not specifically identify any cash proceeds received by Debtors from the sale of Consigned Inventory.  Wells Fargo further emphasizes that, at best, the March 31st Notice is effective only as to sales occurring after March 19, 2017, and on or prior to March 26, 2017.

Electrolux counters that Wells Fargo was the first to breach the Intercreditor Agreement—by way of its "improper challenge to the validity, perfection, priority or enforceability of Electrolux's liens" and by failing to give notice of the "Cash Dominion Event."  Based on these alleged breaches, Electrolux contends that the Court should hold Wells Fargo accountable for its own alleged breaches of the Intercreditor Agreement.

The Court disagrees with Electrolux that Wells Fargo breached the Intercreditor Agreement by "improperly challenging" Electrolux's lien rights.  Wells Fargo has not argued on summary judgment that Electrolux's lien is invalid or even that it is unperfected, although it may very well be.  Instead, Wells Fargo primarily argues that Electrolux has not properly preserved or asserted its lien rights.

The Court also disagrees with Electrolux's contention that Wells Fargo breached the Intercreditor Agreement by not giving notice to Electrolux of a "cash dominion event."  The duty to provide that notice to Electrolux is only triggered when Wells Fargo gives notice to Debtors of a cash dominion event.  However, there is no evidence before the Court that Wells Fargo issued any such notice to Debtors. But more fundamentally, Electrolux's noticing responsibilities under § 1(b) of the Intercreditor Agreement do not depend on the provision of notice of a Cash

Dominion Event under § 6. Rather, Electrolux's obligation to provide written notice is triggered when a Cash Dominion Event "occurs and is continuing." To the extent the bankruptcy itself was a "Cash Dominion Event," Electrolux was well aware of its occurrence.

This argument is buttressed by the Notices themselves, wherein Electrolux concedes that a "Cash Dominion Event has occurred and is continuing." As such, the Court rejects Electrolux's contention that Wells Fargo's alleged breach of the Intercreditor Agreement absolved Electrolux of providing notice in order to assert or preserve its lien rights in "identifiable cash proceeds."

That said, the Court disagrees with Wells Fargo that the Notices were defective because they did not specify "identifiable cash proceeds." Pursuant to § 1(b) of the Intercreditor Agreement, Electrolux merely had to state that cash proceeds from the sale of Consigned Inventory had been deposited into the lockbox and to attach the "Report" as that term is defined in the Consignment Agreement. The Notices conform to those meager requirements. Upon receipt of the Notices, it was Wells Fargo's duty to "pay over to Consignor the amount of such proceeds" "to the extent permitted by applicable law." The Intercreditor Agreement does not put any further burden on Electrolux to identify the cash proceeds.[14]

Based on the foregoing, the Court cannot conclude that summary judgment on Count I or Count IV in favor of Wells Fargo is appropriate. Genuine issues of

---

[14] The Court does agree with Wells Fargo that the March 31st Notice is only effective as to good delivered on after March 19, 2017 pursuant to § 1(b) of the Intercreditor Agreement.

fact remain, including, but not limited to: (1) the amount of identifiable cash proceeds to which Electrolux's lien attached; (2) the effect of the DIP Credit Agreement and DIP Orders on the priority dispute between Wells Fargo and GACP on one hand and Electrolux on the other; and (3) whether proceeds deposited in the lockbox account from credit card sales should be treated as "cash proceeds" subject to Electrolux's lien or treated as an intangible that is not subject to Electrolux's lien under § 1(a) of the Intercreditor Agreement.

### Debtors' Alleged Breach of the Consignment Agreement

In its Third Cause of Action ("Count III"), Electrolux argues that Debtors breached the Consignment Agreement by failing to pay Electrolux for Consigned Inventory "and for the other reasons stated above."[15]  For this alleged breach, Electrolux argues that it is entitled to payment for all Consigned Inventory that has

---

[15]  It is not entirely clear what, definitively, these other reasons are, but the Court will attempt to identify them.  One complaint that Electrolux makes is that Debtors had no authority to grant Wells Fargo or any other entity a security interest in the Consigned Inventory. There are several conflicting provisions within the Consignment Agreement on this point, but at least one provision states that Debtors could grant another party a security interest in the Consigned Inventory with Electrolux's consent.  The Intercreditor Agreement arguably suggests that Electrolux gave such consent.

Electrolux also argues that Debtors did not have authority to sell the Consigned Inventory under a § 363 sale.  It is true that the Interim GOB Sale Order excluded the Consigned Inventory.  But the Consignment Order authorized Debtors to sell the Consigned Inventory "in a manner consistent with the Consignment Agreement and according to past practice."  The Final GOB Sale Order contained similar authority.  Based on these orders, the Court cannot agree that Debtors were without authority to sell the Consigned Inventory.  Questions of fact remains as to whether Debtors sold any Consigned Inventory—at least prior to entry of the Final GOB Sale Order—in a manner inconsistent with past practice, although the Court expresses no opinion as to the significance of that issue.

been sold, both pre- and post-petition and return of any Consigned Inventory still in Debtors' possession.

The Consignment Agreement defines Debtors' bankruptcy as an event of default. To this extent, the Court agrees that Debtors breached the Consignment Agreement and for that reason alone, the Court denies Debtors' request for summary judgment on Count III. Whether Debtors also breached the Consignment Agreement by failing to make payment to Electrolux for the post-petition sale of Consigned Inventory and, if so, the appropriate remedy for such breach present more complex questions that the Court cannot and need not resolve on summary judgment.

To that point, the Court notes that under the terms of the Consignment Agreement, Debtors were clearly obligated to pay Electrolux for the sale of any Consigned Inventory. Pursuant to the terms of the Consignment Order, Debtors were authorized to "pay, honor, and otherwise satisfy" Consignment Agreements. Debtors' banks were similarly authorized "when requested by the Debtors in their business judgment, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on Debtors' bank accounts on account of the prepetition Customer and Consignment Obligations, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable account to make the payments."

However, the Consignment Order also states that "[n]otwithstanding anything to the contrary contained herein, any payment made or to be made under

23

this Order, any authorization contained in this Order, or any claim for which payment is authorized hereunder shall be subject to the requirements imposed on the Debtor under any orders of this Court approving any debtor in possession financing for, or any use of cash collateral by, the Debtor, and any documents providing for such debtor in possession financing."

In truth, Electrolux and Debtors fail to squarely address in their summary judgment briefs the effect of the DIP Credit Agreement and DIP Orders on Debtors' ability to tender payment to Electrolux upon the post-petition sale of Consigned Inventory. The DIP Orders clearly limited Debtors' ability to use cash collateral and granted the DIP Lenders a superpriority interest in any sale proceeds. In addition, while the Intercreditor Agreement is binding on Wells Fargo, GACP is not a party to Intercreditor Agreement—a critical fact that is also not squarely addressed by the parties on summary judgment. Finally, the Court notes that regardless of Electrolux's right to *payment* under the Consignment Agreement, its rights to recover specific sale proceeds by way of its lien in such proceeds is a separate and distinct question, the answer of which may ultimately depend on whether Debtors succeed on their Counterclaims.

Based on the foregoing, the Court denies Debtors' request for summary judgment on Count III.

### Constructive Trust, Unjust Enrichment and Estoppel

Electrolux asserts various quasi-contract claims in several counts of the Amended Complaint. In its Sixth Cause of Action ("Count VI"), Electrolux argues

24

that Debtors and Wells Fargo hold the Consigned Inventory and the proceeds from the sale of Consigned Inventory in a constructive trust.  In its Eight Cause of Action ("Count VIII"), Electrolux argues that Wells Fargo was unjustly enriched by Electrolux's relationship with Debtors and from the sale of Consigned Inventory. And in its Tenth Cause of Action ("Count X"), Electrolux claims that Debtors and Wells Fargo should each be estopped from asserting any rights or taking any action averse to Electrolux's rights under the Consignment Agreement.

In response, Wells Fargo and Debtors argue that because their relationships with Electrolux are governed by express contract—per the Consignment Agreement and the Intercreditor Agreement—claims that sound in quasi-contract are not appropriate.  The Court agrees.

Generally, there can be no constructive trust where there is an express contract between the parties in reference to the same subject matter. *See City of Indianapolis v. Twin Lakes Enter. Inc.*, 568 N.E.2d 1073 (Ind. Ct. App. 1991) (citations omitted) *See Ent. USA, Inc. v. Morehead Comm., Inc.* (N.D. Ind. 2015) *(citing Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) ("Where the rights of the parties are controlled by an express contract, recovery cannot be based on a theory implied in law)).  The same is true for unjust enrichment and estoppel as well.  *CoMentis, Inc. v. Purdue Res. Found.*, 765 F.Supp.2d 1092, 1103 (N.D. Ind. 2011) (plaintiff "may not seek unjust enrichment just in case the contract does not afford it the relief it seeks; a valid contract still governs the parties' rights with respect to the subject matter at issue."); *All-Tech*

25

*Telecom, Inc. v. Amway Corp.*, 174 F.3d 862 (7th Cir. 1999) ("Promissory Estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship . . . and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.") (citations omitted)).

Based on the foregoing authorities, the Court concludes that the Consignment Agreement and Intercreditor Agreement govern the parties' dispute. As such, the Court grants summary judgment in favor of Debtors and Wells Fargo and against Electrolux on Counts VI, VIII and X.

## Conversion

In its Seventh Cause of Action ("Count VII"), Electrolux asserts a claim for conversion and alleges that Debtors and Wells Fargo, "on behalf of the lenders," have wrongfully retained possession of the Consigned Inventory and the proceeds from the sale of such inventory.

As previously discussed, Debtors were authorized to sell Consigned Inventory in the normal course pursuant to the Consignment Order. The undisputed facts simply do not support Count VII to the extent of it alleges conversion of the Consigned Inventory. As the claim relates to sale proceeds, the Court again expresses some trepidation about reliance on a tort remedy in light of the express contracts between the parties. Indeed, there is case law barring tort claims if the parties' relationship is governed by an express contract absent some other extra-

contractual duty.  *See, e.g., Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).

Under Indiana case law,[16] however, an action for conversion can by maintained even if there is an express contract between the parties; the plaintiff, however, must meet the enhanced *mens rea* requirements for conversion.[17]  *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008).  It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover.  *Id.*  To establish this element of the crime of conversion, a plaintiff must show the defendant was aware of a high probability his control over the plaintiff's property was unauthorized.  *Manzon v. Stant Corp.*, 138 F.Supp.2d 1110, 1116 (S.D. Ind. 2001).

---

[16]  None of the parties argue choice of law with respect to Counts VI through X and, without explanation, cite law from a variety of jurisdictions, including Indiana.  In the absence of any cogent analysis from the parties as to which state's law to apply to these counts, the Court has defaulted to Indiana law.

[17]  Indiana Code § 35–43–4–3 provides that "[a] person who knowingly or intentionally exerts *unauthorized control* over property of another person commits criminal conversion . . ." (italics added).  In a civil action for criminal conversion, these elements must be established by a preponderance of the evidence.  "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so."  IND. CODE § 35–41–2–2(a).  "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35–41–2–2(b).  IND. CODE § 35–43–4–1(a) provides that to " 'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Finally, Indiana Code § 35–43–4–1(b) provides in relevant part that a person's control over property of another person is "unauthorized" if it is exerted: (1) without the other person's consent; (2) in a manner or to an extent other than that to which the other person has consented . . . . or (7) by expressing an intention to damage the property or impair the rights of any other person.

27

An ambiguity in the operable contract may defeat the plaintiff's ability to establish that the defendant's exercise of control over the subject property was unauthorized. *See NationsCredit Com. Corp. v. Grauel Ent., Inc.*, 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998), *reh'g denied, trans. Denied*. Conversely, the breach of an unambiguous contract could support a claim for conversion assuming all the other elements of Indiana Code § 35–43–4–3 are met.

Here, the Court has not yet resolved Electrolux's breach of contract claims and is unwilling at this stage in the proceedings to conclude one way or another whether the Consignment Agreement or Intercreditor Agreement are so unambiguous that a breach of them by Wells Fargo or Debtors gave rise to "unauthorized control" of the proceeds. The Court is also unwilling to conclude what effect the DIP Orders and DIP Financing Agreement may have had on the parties' respective rights and duties under the Consignment Agreement and Intercreditor Agreement, even if such rights and duties were otherwise unambiguous. Significant issues of law and fact remain that prevent the Court from granting summary judgment in favor of Debtors or Wells Fargo on Count VII.

## Marshaling

In its Eleventh Cause of Action ("Count XI"), Electrolux invokes the equitable doctrine of marshaling. In response, Wells Fargo argues that Count XI fails as a matter of law because the DIP Orders explicitly provide that marshaling does not apply. The Court agrees.

28

Marshaling is traditionally used to prevent a junior lienholder with a security interest in a single property from being squeezed out by a senior lienholder with a security interest not only in that property, but also in one or more additional properties. The equitable principle of marshaling benefits a junior secured creditor by requiring a senior secured creditor to first attempt to collect amounts owed it from a property or fund in which the junior secured creditor has no interest, thereby producing a greater possibility that there will be remaining value in the fund from which the junior secured creditor can be paid. *In re Enright*, 474 B.R. 854, 862 (Bankr. E.D. Wis. 2012)(quoting 63 Am. Jur. 2d *Marshaling Assets* § 3 (2012)).

As emphasized by Wells Fargo, the DIP Orders provide that "[t]he DIP Agent, the other DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Lenders shall not be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable." In an effort to avoid the clear effect of this language, Electrolux confusingly insists that the Consigned Inventory is *not* DIP Collateral or Prepetition Collateral. If Wells Fargo's lien does not extend to the Consigned Inventory, the Court struggles to understand why Electrolux would need to invoke the doctrine of marshaling in the first place; marshaling is, by definition, invoked against a senior *secured* creditor.

That issue aside, the undisputed evidence before the Court clearly establishes that Wells Fargo has both a pre- and post-petition lien on the Consigned Inventory. As such, Electrolux cannot maintain a claim for marshaling pursuant to the clear

29

terms of the DIP Orders.  The Court therefore grants summary judgment in favor of Wells Fargo on Count XI.

## Third Party Beneficiary

In its Twelfth Cause of Action ("Count XII"), Electrolux argues that it is "the intended third party beneficiary to the DIP Credit Agreement" and is therefore entitled "to enforce the terms of the DIP [Credit Agreement] including but not limited to payment to Electrolux in compliance with the budget and the exclusion of the [Consigned Inventory] and proceeds from the lenders' liens and security interests under the Credit Agreements."  In support, Electrolux emphasizes that the Consignment Agreement is a "Material Contract" as that term is defined in the Credit Agreements and that a default of the Consignment Agreement constitutes an event of default under the Credit Agreements.

Generally, only a party to a contract or those in privity with the contracting parties have rights under the contract.  *Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 729 (Ind. Ct. App. 1984) (citations omitted).  One not a party to the contract may directly enforce the contract as a third party beneficiary only if the contracting parties clearly intended to directly benefit the third party by imposing a duty in the third part's favor.  *Wilson v. Palmer*, 452 N.E.2d 426, 429 (Ind. Ct. App. 1983); *Morgensen v. Martz*, 441 N.E.2d 34, 35 (Ind. Ct. App. 1978).  In other words, a third-party beneficiary contract is formed when (1) the parties to the contract intend to benefit a third party, (2) the contract imposes a duty on one of the parties in favor of the third party, and (3) the performance of the terms of the contract

directly benefits the third party. *Bowman v. Int'l Business Machines Corp.*, 853 F.Supp.2d 766, 769 (S.D. Ind. 2012) (citations omitted). The controlling factor is the intent to benefit the third party. *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citation omitted).

Based on a plain reading of the Credit Agreements, the Court is hard pressed to conclude that Electrolux was "clearly intended" to "directly benefit" from the Credit Agreements simply by making breach of the Consignment Agreement a breach of the Credit Agreements. The definition of "Material Contracts" imposes no additional duty on Debtors or Wells Fargo in favor of Electrolux.

Similarly, the Court rejects Electrolux's allegation in the Amended Complaint that a line item in Debtors' post-petition cash use budget created "third party beneficiary" rights in Electrolux's favor. In the Court's view, a cash use budget does not create an independent right to payment.

Furthermore, the Final DIP Order states that the only third party beneficiaries of the DIP Orders are those explicitly provided for in the DIP Orders. *See* Final DIP Order, ¶ X.E.47. Electrolux has not pointed to, and the Court cannot find, any provision explicitly indicating that Electrolux was an intended third party beneficiary of anything relating to the DIP Credit Agreement or DIP Orders.

For the reasons stated above, the Court grants summary judgment in favor of Debtors and Wells Fargo and against Electrolux on Count XII.

### Waiver

In its Thirteenth Cause of Action ("Count XIII"), Electrolux merely incorporates the preceding paragraphs of the Amended Complaint and asserts— without any elaboration—that "Wells Fargo has waived any rights to any interest in Electrolux's consignment inventory." In its summary judgment motion, Wells Fargo rightly points out Electrolux claim is fatally vague. Perhaps that is why Electrolux offered no rebuttal in its response to the Wells Motion.

Accordingly, the Court summarily grants summary judgment in favor of Wells Fargo and against Electrolux on Count XIII.

## Reclamation

The remaining claim at issue on summary judgment is Electrolux's claim for reclamation stated in its Fourteenth Cause of Action ("Count XIV"). The Court has addressed a similar claim for reclamation made by another of Debtors' suppliers in *Whirlpool Corporation v. Debtors, et al.*, Adversary Proceeding No. 17-50104, wherein the Court ruled against the supplier, citing the primacy of the rights provided to Debtors' post-petition lenders under the DIP Credit Agreement and DIP Orders. That decision is currently on appeal. Given the pending appeal, the Court holds a ruling on the parties' request for summary judgment on Count XIV in abeyance pending resolution of the *Whirlpool* appeal.

## CONCLUSION

Based on the foregoing, the Court grants the Motions as they relate to Counts VI, VIII, X, XII and XIII in favor of Debtors and Wells Fargo and against Electrolux. The Court denies the Motions in all other respects. The

Court holds a ruling on the Motions as they relate to Count XIV in abeyance pending a ruling on the *Whirlpool* appeal.

Although the Court's ruling has resolved some of the issues raised in this adversary, many remain. The Court will schedule a status conference, via separate order, to discuss how this adversary should proceed. All discovery remains held in abeyance until further order of the Court.

###